570 P.2d 305

UNITED NUCLEAR CORPORATION, a
Delaware Corporation,
Plaintiff-Appellee,

v.

GENERAL ATOMIC COMPANY, a part-
nership composed of Gulf Oil Corpora-
tion and Scallop Nuclear, Inc., Defend-
ant-Appellee,

The Detroit Edison Company, a New
Mexico and Michigan Corporation,
Defendant-Appellant,

and

Indiana and Michigan Electric Company,
an Indiana Corp., Defendant-Appellee.

Nos. 11265, 11336.

Supreme Court of New Mexico.

Oct. 18, 1977.

Jones, Gallegos, Snead & Wertheim, James E. Snead, Steven L. Tucker, Santa Fe, Honigan, Miller, Schwartz & Cohn, Detroit, Mich., for appellant.

Bigbee, Stephenson, Carpenter & Crout, Santa Fe, for United Nuclear Corp.

Montgomery, Andrews & Hannahs, Santa Fe, Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, for General Atomic Co.

Johnson, Paulantis & Lanphere, Albuquerque, for Michigan Elec. Co.

## OPINION

McMANUS, Chief Justice.

On December 31, 1975 suit was brought in the District Court of Santa Fe County by United Nuclear Corporation (UNC) against General Atomic Company (GAC). (For background on the issues in the case see, *United Nuclear Corp. v. General Atomic Co.*, 90 N.M. 97, 560 P.2d 161 (1976)). On December 9, 1976 GAC moved to join The Detroit Edison Company (Detroit) as a party. Detroit made a special appearance to contest the in personam jurisdiction. The district court joined Detroit. After being served with process, Detroit moved to quash service. We granted Detroit an interlocutory appeal pursuant to § 21–10–3, N.M.S.A., 1953 (Supp.1975).

We have previously set forth New Mexico's position on the issue of long-arm jurisdiction and the minimum contacts necessary to meet constitutional standards. *United Nuclear Corp. v. General Atomic Co., supra; Telephonic, Inc. v. Rosenblum*, 88 N.M. 532, 543 P.2d 825 (1975). New Mexico has extended its in personam jurisdiction as far as constitutionally permissible. *United Nuclear Corp. v. General Atomic Co., supra*, discussed the authorities and rationale behind the application of the long-arm statute and the due process test as set forth in the leading cases of *Internat. Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); and *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). We do not propose to reiterate that decision. Instead, those principles must be applied to the facts in the instant appeal.

Detroit is a public utility generating and selling electric power and steam to the southeastern portion of Michigan. Detroit is involved in this controversy by virtue of the fact that it has a contract with GAC whereby GAC agreed to supply Detroit the uranium it needed for the nuclear reactor it was in the process of constructing. In 1968 when Detroit decided to enter the nuclear power system field, Detroit and UNC, a Delaware corporation engaged in the mining and milling of uranium, began discussions about obtaining a supply of uranium fuel for the reactor. Negotiations proceeded for several months and in September 1969 Detroit entered into a letter of intent setting forth some terms concerning a future supply contract. Before a formal contract was signed, UNC entered into a part-

nership with Gulf Oil Corporation (Gulf) and formed Gulf United Nuclear Fuels Corporation (GUNFC). In June 1971 UNC requested Detroit to agree to an assignment of the letter of intent to GUNFC. After some investigations by Detroit and after Gulf and UNC guaranteed GUNFC's performance of the uranium agreement, Detroit consented to the assignment. In 1972 a fuel agreement was entered into. In 1973 Gulf purchased UNC's interest in that partnership, and another partnership was created, GAC. The uranium supply agreement was then assigned to GAC, again with Detroit's agreement.

Meanwhile, pursuant to the terms of the contract, UNC was mining and storing the uranium which was to be sold to Detroit. Detroit was not prepared to take delivery of the first load of uranium called for in the contract, and so a trust agreement was created whereby the Trust paid UNC the purchase price for the uranium and UNC stored the uranium in Grants, and the Trust (for Detroit) paid "deferral charges," for not accepting delivery. The amount of the stored inventory was verified by a national accounting firm through its Albuquerque office. There was also a discussion concerning an agreement whereby UNC could borrow from the stockpile and replace the uranium at a future date, and negotiations concerning the reduction of the deferral charges. An amendment to the 1972 fuel agreement was made between GAC and Detroit in 1974.

In 1974 the Trust accepted delivery of the uranium and shipped it to the conversion facility. In early 1975 Detroit sold the first batch of the uranium to a German utility, GKN. Detroit also at this time was negotiating with other uranium suppliers in New Mexico, and had contracted with a New Mexico corporation to supply uranium. GAC and Detroit also agreed that Detroit could negotiate directly with UNC to supply uranium pursuant to the amended fuel agreement subject to GAC's interest.

Detroit also had some unrelated meteorological and consulting work done in New Mexico by local firms or local divisions of national firms.

■ The above is a very brief sketch of the series of complex business activities related to the controversy over the supply of uranium, but it is sufficient to point out that Detroit was an active participant in the purchase and sale of one of New Mexico's natural resources. The most relevant contacts are:

1. Detroit intended to engage a corporation, UNC (whose mines were located in New Mexico) to supply uranium by entering into a letter of intent.

2. Detroit extensively investigated the resources and qualifications not only of UNC but of all subsequent assignees before contracting.

3. Tremendous amounts of uranium were mined, milled and stored in New Mexico for Detroit's benefit, for which millions of dollars were paid, even though title was held by the Trust.

4. Detroit at all times actively negotiated for favorable terms throughout the course of its dealings.

5. Detroit contracted with at least one other New Mexican uranium supplier.

6. The performance of the contract has a substantial impact on the state economy which affects the labor, transportation, services and business markets.

7. Detroit engaged the Albuquerque office of Peat, Marwick, Mitchell & Co. to verify its uranium inventory at UNC facilities in New Mexico.

8. Detroit engaged the firm, E G & G, to provide meteorological services and products which were performed by its Albuquerque division.

9. Detroit engaged the New Mexico consulting firm of Chapman, Wood and Griswold to review technical matters pertaining to uranium reserves and mining.

10. GAC's third-party complaint alleges that Detroit diverted the uranium it had specified for use in its own nuclear system to another purchaser (i. e.,

the German utility), and that that diversion was the basis for the allegation of fraud and breach of fiduciary obligation asserted by UNC against GAC. By this allegation GAC contends that Detroit participated in the commission, or directed the commission, of a tortious act in New Mexico. Although any one of these activities may not be sufficient to meet the "minimum contacts" requirement, in assessing the totality of the circumstances we feel that Detroit's actions have subjected it to New Mexico's jurisdiction.

As we have previously stated in *United Nuclear Corp. v. General Atomic Co.,* supra, when a buyer actively participates, negotiates and dictates contract terms and such a contract has substantial consequences in another state, it is not unfair to subject such a buyer to that state's jurisdiction. Detroit clearly does not meet the passive buyer test of *Vacu-Maid, Inc. v. Covington,* 530 P.2d 137 (Okla.App.1974). Detroit knew that the uranium would be supplied from UNC's mining operations in New Mexico. Detroit thoroughly investigated the corporations which succeeded UNC before agreeing to the assignments. Over a million pounds of uranium were mined for its benefit and Detroit (through the Trust) paid almost two million dollars in deferral charges for the uranium it had stored in this state. Detroit could have invoked New Mexico's laws to recover the stored uranium had UNC or GAC defaulted on the supply agreement. These actions and Detroit's knowledge of business activities carried on in this state pursuant to its directives, supply the "purposefulness" requirement set forth in *Hanson v. Denckla,* supra.

The sale of the uranium to the German utility is alleged to constitute a tortious act by GAC and Detroit under § 21–3–16(A)(3), N.M.S.A. 1953 (Supp.1975). Such a tortious act took place in New Mexico because the uranium was supposedly wrongfully shipped or directed from within the state. This act alone would subject Detroit to jurisdiction in this state.

Detroit is a large, sophisticated interstate corporation. It must have foreseen that its contracts with New Mexican uranium suppliers would have a substantial impact on commerce in this state. As was recently stated in *Vencedor Mfg. Co., Inc. v. Gougler Industries,* 557 F.2d 886, 891 (1st Cir. 1977), "If *International Shoe* stands for anything, however, it is that a truly interstate business may not shield itself from suit by a careful but formalistic structuring of its business dealings." The exercise of jurisdiction over Detroit is necessary to resolve the complex issues in this case and is consistent with "traditional notions of fair play." Substantial justice could not be done in this case in the absence of Detroit, a major figure in the unfolding drama of corporate machinations.

Another court has also concluded that all the issues should be consolidated and decided simultaneously. In *Indiana & Michigan Electric Co. v. Gulf Oil Corporation,* 76 Civ. 881 (S.D.N.Y. Jan. 5, 1976), Judge Frankel granted defendant Gulf's motion to dismiss for lack of an indispensable party—UNC, and found that New Mexico was a proper forum in which all the issues could be presented. He also stated that there was no need for piecemeal litigation. Indiana & Michigan Electric Co. (I & M), the public utility involved, was contesting GAC's efforts to implead I & M in the actions pending in New Mexico. The court went on to state:

> In equity and good conscience, the court cannot countenance the continuation of this lawsuit without the presence of UNC when to do so would likely result in duplicative litigation, possible prejudice, and incomplete resolution of the matters at issue.

We recognize that the New York federal district court had different considerations before it and that the court was not concerned with the New Mexico jurisdictional issue; however, that court's conclusion reinforces our own opinion that New Mexico can best settle the issues, completely, fully and finally because all parties have the most contacts with this state.

Therefore, we affirm the decision of the District Court of Santa Fe County.

IT IS SO ORDERED.

SOSA, and PAYNE, JJ., concur.