2002-NMCA-030

42 P.3d 1221

**SANTA FE TECHNOLOGIES, INC., Plaintiff–Appellee,**

v.

**ARGUS NETWORKS, INC., and David L. Jannetta, et al., Defendants– Appellants.**

Nos. 21,381, 21,382, 21,469, 21,470.

Court of Appeals of New Mexico.

Dec. 13, 2001.

Certiorari denied, No. 27,285, Feb. 28, 2002; No. 27, 324, March 6, 2002.

John B. Pound, Herrera, Long, Pound & Komer, P.A., Santa Fe, NM, Alan N. Salpeter, Harley Hutchins, Mayer, Brown & Platt, Chicago, IL, for Appellee.

Tim L. Fields, Michelle A. Martinez, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, Paul R. Rosen, Timothy C. Russell, Michael C. Wagner, Spector Gadon & Rosen, P.C., Philadelphia, PA, for Appellants TL Ventures LLC, Mark J. DeNino, and Michael D. Burns.

Tim L. Fields, Michelle A. Martinez, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, Alan K. Cotler, Andrew P. Hoppes, Klett Rooney Lieber & Schorling, Philadelphia, PA, for Appellants Argus Networks, Inc. and David L. Jannetta.

## OPINION

WECHSLER, Judge.

{1} We examine in this appeal the scope of personal jurisdiction over out-of-state Defendants in a business tort action, including the issue of conspiracy as a basis for personal jurisdiction. Defendants, Argus Networks, Inc. (Argus), David Jannetta (Jannetta), TL Ventures, LLC (TL), Michael Burns (Burns), and Mark DeNino (DeNino) appeal the district court's refusal to dismiss the complaint of Santa Fe Technologies, Inc. (SFT) for lack of personal jurisdiction, or, alternatively, to compel arbitration. All Defendants applied for interlocutory appeal as to the personal jurisdiction and arbitration rulings and filed notice of direct appeal of the denial of the arbitration motion pursuant to NMSA 1978, § 44–7–19(A) (1971). We granted the interlocutory appeals and consolidated the cases to review both the personal jurisdiction and arbitration issues as to all Defendants. We affirm the district court on all issues, concluding that the district court has personal jurisdiction over all Defendants and that the arbitration clause at issue does not compel arbitration in this case.

### The Parties

{2} At its core, this case involves a failed business venture between SFT and Defendants. SFT sued Argus, its CEO, Jannetta, TL, two of its principals, Burns and DeNino, and three principals of Sensor Management Systems (SMS), the New Mexico corporation that replaced SFT in the venture. All of the parties are interrelated.

{3} SFT is a New Mexico corporation, with its principal place of business in New Mexico at the time of occurrence of the actions giving rise to this lawsuit and with additional offices in Virginia and Florida. Dwight Sangrey was SFT's CEO. Argus is a Delaware corporation with its principal place of business in Pennsylvania. Although Argus is now reincorporated under a new name, we will refer to it as Argus. Jannetta, a Pennsylvania resident, was president of Argus. TL is a limited liability company with its principal place of business in Pennsylvania. It manages private equity funds, one of which is a shareholder in Argus. TL argues that it "has never had any operating role or responsibility for the conduct" of Argus' business. However, Burns, a resident of Pennsylvania and employee of TL, is a stockholder, director, and officer of Argus. DeNino, also a resident of Pennsylvania, is managing director of TL as well as a director of Argus. Brian Malewicz is a shareholder in Argus and former schoolmate of Burns. The principals of SMS are Defendants Mark Nash, Jerry Musnitsky, and Harvey Dollar, who are residents of New Mexico, stockholders in SFT, and former employees of SFT. The SMS defendants are not party to this appeal.

### Facts and Procedural Background

{4} In 1997, Jannetta first contacted SFT in New Mexico on behalf of Argus by telephone from Pennsylvania to participate in a bid for a traffic monitoring contract with the federal government to be performed in Pennsylvania. Throughout 1998, SFT discussed the structure of the companies' future business relationship with Jannetta, Burns, and DeNino. A merger was proposed, and stock ownership percentages in the new venture were decided among Argus, Jannetta, Burns, DeNino, and TL. The merger would occur if

the federal government granted the contract to the Argus SFT venture. All in-person negotiations for the prospective merger occurred in Pennsylvania. SFT's lawyers drafted the Merger Plan Agreement (Agreement) in Utah, and Argus' lawyers negotiated revisions from Pennsylvania. The parties signed the Agreement in Pennsylvania in November 1998.

{5} The Agreement provided that each party had the right to terminate the Agreement for any reason if the merger was not closed by December 15, 1998. The Agreement also contained provisions requiring arbitration of "any breach, default, dispute, controversy, or claim arising out of or relating to this Agreement" and deeming arbitration the "sole and exclusive remedy ... respecting any dispute, protest, controversy, or claim arising out of or relating to this Agreement."

{6} Between July 1998 and February 1999, Sangrey met with DeNino up to three times monthly in Philadelphia. The federal government issued the Request for Proposals for the traffic monitoring system in December 1998, and Argus and SFT began working on the bid. The Request for Proposals required that bidders employ a pre-qualified prime contractor under whose auspices the subcontractor proposal would be made. SFT and Jannetta chose SIGNAL Corporation as the prime contractor for the Argus bid. SIGNAL was incorporated and had its principal place of business in Virginia. Most of the subcontractors chosen to participate in the SIGNAL team were from Pennsylvania, Maryland, Virginia, and Washington, D.C. Although most of the bid preparation work took place in Virginia, and no one from Argus or TL came to New Mexico during this time, the administrative function of SFT and Argus was performed in Albuquerque, where some employee records of Jannetta, Malewicz, and TL were kept. According to SFT's CEO, Dwight Sangrey, Argus and SFT functioned "de facto as an integrated operating company."

{7} During bid preparations in December, Argus claimed to have learned that SFT was experiencing financial problems and it claimed that such problems made Argus suspect of SFT's ability to perform. Argus eventually concluded that SFT's references from the performance of other government contracts were suspect. Additionally, SFT had not reached its actual revenue goal for 1998. Argus thus extended a loan to SFT to cover its payroll in exchange for a lower equity percentage if the merger went through. At this time as well, Jannetta and another Argus employee were receiving their paychecks from the SFT payroll in New Mexico. Jannetta also had a cell phone with a New Mexico telephone number and was carried on SFT insurance and health plans. Argus reimbursed SFT for these payments and paid a portion of two SFT employees' salaries.

{8} In mid-February, Jannetta and Burns began discussing the replacement of SFT on the bidding team. Jannetta proposed that Argus consider another New Mexico corporation, SMS. On February 13, 1999, Burns relayed to DeNino that Argus and Jannetta were considering potential replacements for SFT. Joe Cal of Northern Transportation Systems, a subsidiary of SMS, contacted Jannetta by telephone on February 19, 1999. Sangrey had introduced Cal to Jannetta on December 30, 1998, when Sangrey had wanted to involve SMS in the installation of traffic sensors as part of the federal contract. From the TL conference room in Pennsylvania, Jannetta and Burns telephoned Nash and Musnitsky of SMS in Albuquerque and discussed collaborating on the federal contract. They set a meeting in San Francisco for the following week. Burns then notified DeNino of the talks with SMS. DeNino approved the discussions but expressed concern over potential legal action from SFT.

{9} Burns and SMS met in San Francisco where Burns identified himself as affiliated with TL and explained TL's ownership interest in Argus. He explained that he was authorized to speak for Argus and make an offer on their behalf. When Burns notified Jannetta and Malewicz that this meeting was unsuccessful, they decided that Malewicz would meet with SMS to facilitate a deal. Malewicz met with Nash, Musnitsky, and another SMS principal in Albuquerque on February 23, 1999. Malewicz maintained

telephone contact with Jannetta and Burns throughout his talks with SMS. The parties agreed that Argus would purchase SMS and that SMS would replace SFT on the bidding team for the federal contract. On February 24, 1999, Argus notified SFT by facsimile transmission that it was terminating the Agreement. Later that same day, Argus and SMS signed a letter of intent in Pennsylvania and New Mexico, respectively. On February 26, 1999, Argus told SFT that it would not be included in the federal contract project.

{10} On March 1, 1999, Argus and SMS signed a stock purchase agreement, exchanging stock and cash, and SMS became a wholly owned subsidiary of Argus. Argus additionally arranged to replace SMS principals as guarantors on some SMS debts to New Mexico banks. Argus and SIGNAL submitted their bid for the traffic contract to the federal government with SMS in place of SFT. The federal government subsequently awarded the contract to Argus with SMS.

{11} SFT filed its complaint in July 1999 alleging that Defendants "combined and conspired to divert and steal ... a corporate opportunity that Santa Fe identified, developed, owned and was ready to perform," and that it was entitled to monetary damages as result of its exclusion from the federal bid. SFT alleged interference with prospective contractual relations, usurpation of business opportunity, fraud, and conspiracy to commit the aforementioned torts, among other claims. Argus and Jannetta filed two motions to dismiss, alleging that (1) the merger agreement required SFT's claims to be arbitrated and (2) the court lacked personal jurisdiction over Defendants. TL, Burns, and DeNino filed similar motions. The district court allowed discovery, briefing, and argument. Ultimately, the district court denied all four motions without specific findings but certified for interlocutory appeal both the issue of arbitration as well as personal jurisdiction to this Court. Defendants appealed. We granted the interlocutory appeal and now affirm.

*Personal Jurisdiction*

*Standard of Review*

▮ {12} The issue of whether the district court has personal jurisdiction over the non-resident Defendants in this case is a question of law, which we review de novo. *Cronin v. Sierra Med. Ctr.*, 2000–NMCA–082, ¶ 10, 129 N.M. 521, 10 P.3d 845. When the district court bases its ruling on the pleadings and affidavits, the standard of review resembles that of summary judgment; the appellate court reviews the pleadings and affidavits or sworn testimony in the light most favorable to the party asserting jurisdiction. *Id.* In this case, the district court did not hold an evidentiary hearing. Therefore, the party asserting jurisdiction "need only make a prima facie showing that personal jurisdiction exists." *Id.*

*Long–Arm Jurisdiction*

▮ {13} Generally, to find personal jurisdiction over non-residents, New Mexico requires the satisfaction of a three-part test:

(1) the defendant's act must be one of the five enumerated in the long-arm statute; (2) the plaintiff's cause of action must arise from the act; and (3) minimum contacts sufficient to satisfy due process must be established by the defendant's act.

*State Farm Mut. Ins. Co. v. Conyers*, 109 N.M. 243, 244, 784 P.2d 986, 987 (1989); *see also* NMSA 1978, § 38–1–16 (1971). However, as "[t]he first and third step of this test have been 'repeatedly equated' with the due process standard of 'minimum contacts,'" the necessity of a technical determination of whether the non-resident committed an act enumerated by the long-arm statute has evaporated. *Fed. Deposit Ins. Corp. v. Hiatt*, 117 N.M. 461, 463, 872 P.2d 879, 881 (1994) (quoting *Kathrein v. Parkview Meadows, Inc.*, 102 N.M. 75, 76, 691 P.2d 462, 463 (1984)); *see also Tarango v. Pastrana*, 94 N.M. 727, 728, 616 P.2d 440, 441 (Ct.App. 1980). Rather, we "'search for the outer limits of what due process permits,'" *Hiatt*, 117 N.M. at 463, 872 P.2d at 881 (quoting *Forsythe v. Overmyer*, 576 F.2d 779, 782 (9th Cir.1978)), because New Mexico's long-arm statute will extend as far as the constitution allows. *United Nuclear Corp. v. Gen. Atomic Co.*, 91 N.M. 41, 42, 570 P.2d 305, 306 (1977). Thus, for the court to find personal

jurisdiction, a plaintiff must allege an occurrence that falls within the long-arm statute, and the court must find the requisite minimum contacts to comport with due process. *Cronin*, 2000–NMCA–082, ¶ 20, 129 N.M. 521, 10 P.3d 845.

### Commission of Tortious Act Within New Mexico by Defendants

{14} The first part of the three-step test requires that the "defendant's alleged acts ... fall into a category ... specifically enumerated in the New Mexico long-arm statute." *DeVenzeio v. Rucker, Clarkson & McCashin*, 1996–NMCA–064, ¶ 9, 121 N.M. 807, 918 P.2d 723. New Mexico's long-arm statute provides:

> A. Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts enumerated in this subsection thereby submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from:
>
> > (1) the transaction of any business within this state;
> >
> > ....
> >
> > (3) the commission of a tortious act within this state.

Section 38–1–16(A)(1),(3). SFT alleges that Defendants and their agents, Malewicz and SMS, committed tortious acts within New Mexico, expecting the injury to SFT to occur within New Mexico. The alleged torts arise out of the interference with SFT's business opportunity when Argus purchased SMS through the facilitation of Malewicz and replaced SFT in the federal contract bid. We agree with SFT that its causes of action arise out of an alleged tortious act committed in this state under the long-arm statute supported by sufficient minimum contacts through Defendants' actions and those of their agent Malewicz to satisfy due process as to all Defendants except DeNino. Thus, we need not consider SFT's other asserted bases, transaction of business or the agency of SMS, for personal jurisdiction under the statute. *See Visarraga v. Gates Rubber Co.*, 104 N.M. 143, 146, 717 P.2d 596, 599 (Ct.App. 1986).

{15} For purposes of the long-arm statute, a "tortious act" can occur in New Mexico when the actual harmful act originates outside the state, but the injury itself occurs inside New Mexico. *See Peralta v. Martinez*, 90 N.M. 391, 393, 564 P.2d 194, 196 (Ct.App.1977). This is the "place-of-the-wrong" rule as accepted by our Supreme Court. *Cronin*, 2000 NMCA 082, ¶ 18, 129 N.M. 521, 10 P.3d 845; *see Torres v. State*, 119 N.M. 609, 613, 894 P.2d 386, 390 (1995). The place of the wrong is " 'the location of the last act necessary to complete the injury.' " *Id.* at 613, 894 P.2d at 390 (quoting *Wittkowski v. State, Corr. Dep't*, 103 N.M. 526, 528, 710 P.2d 93, 95 (Ct.App.1985) *overruled on other grounds by Silva v. State*, 106 N.M. 472, 745 P.2d 380 (1987)). A tort is not complete until the plaintiff suffers a cognizable injury. *Peralta*, 90 N.M. at 393, 564 P.2d at 196 ("A wrong without damage or damage without wrong does not amount to a cause of action."). SFT alleges that it suffered economic loss as a result of its exclusion from the federal bid and the substitution of SMS. This alleged economic loss is the "cognizable injury" which completes the tort in New Mexico and satisfies the first two prongs of the three part test for personal jurisdiction: that SFT allege one of the enumerated acts in the long-arm statute and that the cause of action arise from those acts.

### Constitutional Due Process

{16} The principles of constitutional due process are well settled. Due process requires that an out-of-state defendant have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted). A minimum contacts analysis focuses on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). There must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws,"

*Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), and the case must arise from these activities. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). *See also Conyers,* 109 N.M. at 245, 784 P.2d at 988 (the "purposeful availment" test is the "key focus" of the due process analysis). Stated another way, the non-resident's activities in the forum state should be "such that he [or she] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

{17} Thus, personal jurisdiction cannot be based on "random, isolated, or fortuitous" contacts, *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), as opposed to "deliberate" activities. *Burger King Corp.,* 471 U.S. at 475–76, 105 S.Ct. 2174. However, the lack of physical contact with the forum will not defeat personal jurisdiction as long as "a commercial actor's efforts are 'purposefully directed' toward residents" of that forum. *Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. 2174 (quoting *Keeton,* 465 U.S. at 774, 104 S.Ct. 1473).

{18} We apply these principles to evaluate whether Defendants' minimum contacts are such that the lawsuit comports with Defendants' due process protections.

*Sufficiency of Defendants' Contacts with New Mexico*

{19} Argus and TL contend that they lack the necessary minimum contacts with New Mexico to support personal jurisdiction. SFT argued to the district court that an intentional tort, such as that alleged in this case, gives rise to personal jurisdiction based on its purposeful nature alone. SFT relies on *Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), in which the United States Supreme Court found personal jurisdiction in California over Florida residents for the tortious act of libel in a nationally circulated magazine, concluding that the impact of the libel was intentionally directed toward California, the plaintiff's residential state and place of business, and the defendant could expect suit

based on the article's truth. We decline to apply this reasoning under these circumstances. An intentional tort without minimum contacts does not comport with due process. *See DeVenzeio,* 121 N.M. at 811, 918 P.2d at 727 (concluding that economic loss alone not sufficient for personal jurisdiction based on intentional tortious acts of fraudulent misrepresentation when non-resident defendant "did not avail himself of the privilege of conducting activities in New Mexico").

{20} Argus argues that business torts as alleged by SFT find their locus of commission where the contractual rights lie or at the focal point of the business relationship, instead of the location of the SFT's principal place of business or the place of injury, citing *Far West Capital, Inc. v. Towne,* 46 F.3d 1071, 1079–80 (10th Cir.1995) and *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 771–73 (5th Cir.1988). TL contends that SFT's alleged economic injury in New Mexico is not enough to justify personal jurisdiction over a non-resident defendant, relying on *DeVenzeio,* 121 N.M. at 810–11, 918 P.2d at 726–27.

{21} We do not entirely disagree with Defendants' arguments. The constitutional inquiry, however, is not dependent upon the type of tort or the underlying transaction in dispute. The inquiry is whether Defendants have such minimum contacts with New Mexico so that the suit does not offend due process. The location of a business's activities or performance of a contract is but one factor in the minimum contacts analysis. The cases cited by Argus all base their reasoning on the same rationale: minimum contacts are necessary for the court to exert jurisdiction. As the court in *Far West Capital, Inc.* stated,

> [T]he mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts.... [A] court must undertake a particularized inquiry as to the extent to

which the defendant has purposefully availed itself of the benefits of the forum's laws.... We therefore examine "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." In addition, we examine the contacts created by the out-of-state defendant in committing the alleged tort.

*Far W. Capital, Inc.*, 46 F.3d at 1079–80 (quoting *Burger King Corp.*, 471 U.S. at 479, 105 S.Ct. 2174). Finding the language of *Far West Capital, Inc.* instructive, we now turn to the facts alleged in this case.

{22} The relationships among the Pennsylvania Defendants are significant to our discussion. Jannetta is the president of Argus of which Burns is both officer and director, and DeNino is a director of Argus as well. DeNino is the managing director of TL which invests in Argus, and Burns is TL's employee. Malewicz is a friend of Burns, a shareholder in Argus, and a signatory on the Agreement on behalf of Argus. Of these four individuals, only one, Malewicz, physically entered New Mexico during the time period of the alleged occurrence or beforehand during negotiations with SMS. Because the key focus of a personal jurisdiction, minimum contacts analysis is "purposeful availment," we look at Defendants' activities directed toward New Mexico. *See Conyers*, 109 N.M. at 245, 784 P.2d at 988.

{23} Initially, we note that Argus and Jannetta reached out to New Mexico when they contacted SFT in Albuquerque in 1997. This contact led to merger negotiations from June to November of 1998 between the two companies to better pursue the federal bid opportunity. These negotiations occurred in Pennsylvania and were attended by DeNino and Burns, as representatives of TL, and Jannetta, as representative of Argus. During the months following the Agreement, Argus loaned money to SFT, and Jannetta and one other employee were paid through SFT payroll service. Argus, in turn, reimbursed SFT for these costs and paid part of SFT's salaries for its CEO and CFO. Jannetta was carried on SFT employee insurance and health plans and had a New Mexico cell phone and telephone number provided by

SFT. The administrative function of the two companies and some employee records of Argus and TL were located in Albuquerque.

{24} Looking to the " 'prior negotiations and contemplated future consequences,' " Defendants' actions demonstrate an intent to do business themselves in New Mexico and with a New Mexico company. *Far W. Capital, Inc.*, 46 F.3d at 1079 (quoting *Burger King Corp.*, 471 U.S. at 479, 105 S.Ct. 2174). They solicited a New Mexico company with which they wanted to do business and then acted as if the two companies were one, intermingling funds, extending loans, and planning for a future merger. These interactions with SFT were not "random" or "fortuitous" contacts, but rather deliberate actions to further a potentially lucrative business relationship. *See Keeton*, 465 U.S. at 774, 104 S.Ct. 1473.

{25} Additionally and significantly, Argus, TL, Jannetta, and Burns had physical contact with New Mexico, based on the actions of Defendants' agent, Malewicz, in the state. We do not agree with Defendants' argument that, because Malewicz did not have authority to bind Argus or TL, he was not an agent for personal jurisdiction purposes. *See, e.g., Romero v. Mervyn's*, 109 N.M. 249, 253–54, 784 P.2d 992, 996–97 (1989).

{26} Our long-arm statute provides that the actions of an agent are imputed to the principal for the purposes of personal jurisdiction. *See* § 38–1–16(A) ("Any person ... who in person or through an agent does any of the acts enumerated ... submits himself ... to the jurisdiction of the courts of this state."). "An agent is one authorized by another to act on his behalf and under his control." *Hansler v. Bass*, 106 N.M. 382, 387, 743 P.2d 1031, 1036 (Ct.App. 1987); *see also Carlsberg Mgmt. Co. v. State, Taxation & Revenue Dep't*, 116 N.M. 247, 251, 861 P.2d 288, 292 (Ct.App.1993) ("[T]he retention of control by [the principal] and the delegation of specified duties indicates an agency relationship."); Restatement (Second) of Agency § 1, at 7 (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the

other so to act."). The existence of agency is a question of fact. *Carlsberg Mgmt. Co.*, 116 N.M. at 251, 861 P.2d at 292. SFT bears the burden of proof to make a prima facie showing of agency for all jurisdictional allegations. *Swindle v. Gen. Motors Acceptance Corp.*, 101 N.M. 126, 129, 679 P.2d 268, 271 (Ct.App. 1984).

{27} Jannetta and Burns, who represented both Argus and TL in connection with SMS, specifically sent Malewicz to New Mexico as an envoy on their behalf to facilitate negotiations with SMS, a New Mexico corporation, about replacing SFT on the federal bid. No one disputes that Malewicz did not have authority to bind Argus contractually. However, this lack of authority does not preclude Malewicz from being an agent for Jannetta or Burns. Some agents have authority only to transmit or receive information on behalf of the principal. *Diversified Dev. & Inv., Inc. v. Heil*, 119 N.M. 290, 297–98, 889 P.2d 1212, 1219–20 (1995) (stating that an agent can have authority to speak for principal but not have authority to bind principal contractually). Deposition testimony showed that Malewicz acted on behalf of Jannetta and Burns and under their direction and control. *See Carlsberg Mgmt. Co.*, 116 N.M. at 251, 861 P.2d at 292; *Tercero v. Roman Catholic Diocese*, 1999–NMCA–052, ¶ 26, 127 N.M. 294, 980 P.2d 77 (finding agency relationship between priest and out-of-state diocese for purposes of long-arm statute when diocese sent priest to New Mexico to supervise another priest and delegated power to the former to remove censure from the latter). *Cf. Campos Enters., Inc. v. Edwin K. Williams & Co.*, 1998–NMCA–131, ¶ 18, 125 N.M. 691, 964 P.2d 855 (finding no agent-principal relationship between franchisee and franchisor when franchisor had no day-to-day control over franchisee's business). Malewicz was a "facilitator" in the negotiations and maintained telephone contact with Jannetta throughout his stay.

{28} Thus, Burns and TL had a physical, in-state contact with New Mexico through Malewicz, Argus, and Jannetta. Later, Argus, Jannetta, Burns, TL, and DeNino decided to pursue a second New Mexico company, SMS. Jannetta and Burns called Albuquerque and contacted SMS. In San Francisco, Burns made representations that he appeared on behalf of Argus and TL, connecting both Argus and TL as joint-venturers. With this connection, the physical contact of Malewicz can be imputed to his principals, Argus, Jannetta, Burns, and TL. We exclude DeNino because SFT did not present or allege facts that DeNino specifically knew of or facilitated Malewicz' trip to New Mexico.

{29} Although there was only a single physical, in-state contact, the extent of the business interaction between Argus, TL, Jannetta, and Burns with SFT in New Mexico and their decision to pursue a second New Mexico company belies any argument that Argus, Jannetta, TL, and Burns could not have " 'reasonably anticipate[d] being haled into [our] court[s]' " for its activities with SFT. *Tercero*, 1999–NMCA–052, ¶ 18, 127 N.M. 294, 980 P.2d 77 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. 559). Nor do we have to stretch to characterize as "purposeful" the dispatch of Malewicz to Albuquerque to negotiate with SMS. As a consequence, the district court properly found personal jurisdiction based on sufficient minimum contacts to satisfy long-arm jurisdiction over Argus, TL, Jannetta, and Burns.

*Personal Jurisdiction Based on Conspiracy*

{30} We conclude above that DeNino did not have sufficient minimum contacts with New Mexico based on Malewicz's actions because DeNino lacked specific participation in the dispatch of Malewicz to New Mexico. SFT asserts, however, that personal jurisdiction lies over Defendants based on a conspiracy, claiming that Defendants conspired with the in-state New Mexico Defendants of SMS to tortiously replace SFT on the proposal for the federal contract and that economic harm resulted from its exclusion. Due to our conclusions above, we confine our evaluation of SFT's conspiracy argument to DeNino. As we discuss below, personal jurisdiction based on conspiracy rests on principles of agency. As such, it is but a short step from our earlier agency analysis. We agree that SFT

has presented prima facie evidence that DeNino had knowledge of, and participated in, an alleged agreement to intentionally interfere with SFT's contractual relations to pursue the federal contract bid to the detriment of and without the knowledge of SFT, and that DeNino is subject to personal jurisdiction in the New Mexico courts premised on a conspiracy claim.

### Satisfaction of Due Process of Personal Jurisdiction Based on Conspiracy

∎ {31} Personal jurisdiction based on conspiracy is premised on the concepts that jurisdictional contacts of one in-state conspirator may be imputed to a non-resident co-conspirator or that "the acts of a nonresident conspirator, which establish sufficient contacts with the forum state [under the] state's long arm statute, are likewise sufficient to establish personal jurisdiction over nonresident coconspirators." *Am. Land Program, Inc. v. Bonaventura Uitgevers Maatschappij,* 710 F.2d 1449, 1454 (10th Cir.1983). The issue of whether conspiracy provides an adequate constitutional foundation for personal jurisdiction has challenged courts throughout the country, with differing results.

{32} Some courts have concluded that knowledge of and voluntary participation in a conspiracy with other individuals who have physical, in-state presence does not offend due process and allows the court to extend personal jurisdiction over a non-resident who may lack specific, individualized contacts with the forum state. *See Istituto Bancario Italiano v. Hunter Eng'g Co.,* 449 A.2d 210, 225 (Del.1982) ("[A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws."); *Rudo v. Stubbs,* 221 Ga.App. 702, 472 S.E.2d 515, 516–17 (1996) (recognizing that co-conspirators are agents of each other for purposes of personal jurisdiction when acting in furtherance of conspiracy but requiring specific facts of activity purposefully directed toward Georgia residents). Our Supreme Court alluded to conspiracy as a via-

ble basis for personal jurisdiction in *Sanchez v. Church of Scientology,* 115 N.M. 660, 663, 857 P.2d 771, 774 (1993), although the Court declined to find jurisdiction because the plaintiff was unable to make a prima facie showing that a conspiracy existed.

{33} Other states, such as California, Texas, and Washington, have rejected conspiracy as a basis for personal jurisdiction because it relies on the imputation of contacts from one co-conspirator to another, which, arguably offends due process. *See, e.g., Kipperman v. McCone,* 422 F.Supp. 860, 873 n. 14 (N.D.Cal. 1976) (rejecting conspiracy theory for personal jurisdiction as it relies on imputed conduct); *Mansour v. Superior Court,* 38 Cal. App.4th 1750, 46 Cal.Rptr.2d 191, 197 (1995) (explaining that California does not recognize conspiracy as a basis for personal jurisdiction because it does not require individualized contacts with the forum state); *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 773 (Tex.1995) (explaining that the imputation of contacts under a conspiracy theory in absence of any traditional minimum contacts "distract[s] from the ultimate due process inquiry: whether the out-of-state defendant's contact with the forum [is] such that it should reasonably anticipate being haled into a court in the forum state"); *Hewitt v. Hewitt,* 78 Wash.App. 447, 896 P.2d 1312, 1316 (1995) (holding that the imputation of contacts via a conspiracy theory violated due process). These cases, relied on by Defendants, reject jurisdiction based on conspiracy due to the historical evaluation of each non-resident's individualized contact with the forum state. However, it does not appear that these cases consider whether adoption of an appropriately limited conspiracy analysis of jurisdiction might satisfy due process.

∎ {34} We believe that the elements of knowledge and voluntary participation can create "minimum contacts" with the forum state such that personal jurisdiction based on a conspiracy can be constitutionally sound. When appropriately found, personal jurisdiction in an alleged conspiracy is not based on "random" or "fortuitous" contacts. *Keeton,* 465 U.S. at 774, 104 S.Ct. 1473. Nor is it based on the "unilateral activity of another party or a third person."

*Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. 2174 (internal quotation marks and citation omitted). Conspiracy is based on the principles of agency. *See, e.g., Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122–23 (2d Cir.1981) (applying a conspiracy analysis under the agency component of New York's long-arm statute). In a conspiracy, an individual's actions in furtherance of the conspiracy are not unilateral because conspiratorial acts have at their foundation an agreement and the involvement of other co-conspirators. Because an act in furtherance of the conspiracy is on behalf of the conspiracy, the contacts with the forum of the co-conspirator performing the act may become contacts for other co-conspirators. We agree with the Delaware Supreme Court that:

> a defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws.

*Istituto Bancario Italiano,* 449 A.2d at 225. Therefore, the substantial contact with New Mexico through the actions of conspirators in furtherance of a conspiracy can make the exercise of jurisdiction by our courts reasonable and fair.

 {35} Moreover, New Mexico has an interest in providing a forum when appropriate. As the Supreme Court stated in *Burger King Corp.,* 471 U.S. at 473–74, 105 S.Ct. 2174 (citations omitted):

> A[s]tate generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.... [W]here individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account ... for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.

We recognize that the Due Process Clause as a "territorial shield" is correctly invoked to protect a non-resident who is brought into a forum with which he or she has no contact. However, we believe that, when properly limited, personal jurisdiction based on a conspiracy recognizes both the state's interest in the provision of a forum for its citizens and the constitutional protections of due process.

 {36} We explained above that conspiracy rests on principles of agency and, as such, those actions of a co-conspirator in furtherance of the conspiracy which create contact with the forum state can be properly attributed to other co-conspirators when the plaintiff can demonstrate that the non-resident co-conspirators had sufficient knowledge of and participation in the acts that occurred in the forum state and the resultant effect of those acts was foreseeable. We conclude that SMS is an in-state co-conspirator of DeNino such that its contacts in furtherance of the conspiracy in New Mexico are properly attributed to DeNino for purposes of personal jurisdiction.

{37} In this case, SFT did not present any facts that DeNino himself solicited SMS for substitution on the federal bid. However, DeNino was an active participant in the original negotiations with SFT and knew of and later approved the pursuit and substitution of SMS for SFT for the federal contract bid in concert with Burns and Jannetta. DeNino's approval was one of the actions SFT has alleged set in motion the sequence of events in New Mexico which ultimately resulted in the alleged economic harm to SFT.

{38} DeNino's activities were directed toward New Mexico because he knew or should have known that SMS, upon its agreement, would perform in New Mexico the actions in furtherance of the conspiracy of which he had approved. SMS is a New Mexico corporation with New Mexico principals. It was reasonably foreseeable to DeNino that any action by SMS would originate from its headquarters in this state even though the original meeting had taken place in San Francisco. Although SMS was not a direct agent of DeNino, it was an alleged co-conspirator. SMS voluntarily and knowingly participated in the plan of which DeNino was a part, to substitute itself at the last moment for SFT on the federal contract bid and take the steps to bring that plan to fruition in New Mexico.

These actions, allegedly substantial actions in furtherance of the conspiracy, included both the agreement itself to replace SFT and the subsequent conduct to effect the replacement.

{39} We believe that, because DeNino gave his approval to the substitution of SMS for SFT, precipitating the events in New Mexico of which SFT complains, personal jurisdiction of the state's courts over DeNino as a co-conspirator with SMS is sound. *See Istituto Bancario Italiano,* 449 A.2d at 225 (concluding that non-resident co-conspirator is subject to personal jurisdiction when plaintiff can show that non-resident was member of conspiracy that performed a substantial act in furtherance of the conspiracy in the forum and that non-resident had knowledge of the act and its foreseeable effects in the forum). The extension of DeNino's actions in New Mexico are such that he could foresee harm in the state and, thus, could reasonably foresee being haled into a New Mexico court to account for the consequences of his actions and decisions. *See World–Wide Volkswagen Corp.,* 444 U.S. at 297, 100 S.Ct. 559.

*Prima Facie Case of Conspiracy*

{40} TL, Burns, and DeNino further contend that, even if conspiracy were an accepted basis for personal jurisdiction in New Mexico, SFT did not make out a prima facie case of conspiracy. *See Sanchez,* 115 N.M. at 662–64, 857 P.2d at 773–75. We disagree and conclude that SFT has made a prima facie showing of conspiracy to intentionally interfere with prospective contractual relations.

{41} To assert personal jurisdiction based on a conspiracy, SFT must make a prima facie showing of conspiracy upon a non-resident defendant's denial that a conspiracy exists. *See Campos Enters., Inc.,* 1998–NMCA–131, ¶ 6, 125 N.M. 691, 964 P.2d 855; *Baldridge v. McPike, Inc.,* 466 F.2d 65, 68 (10th Cir.1972). A prima facie showing consists of specific facts that, if proven, would allow a factfinder to find the existence of a conspiracy. *State v. Armijo,* 90 N.M. 12, 15, 558 P.2d 1151, 1154 (Ct.App.1976). Mere allegations are not sufficient, *Am. Land Program, Inc.,* 710 F.2d at 1454, but all factual

disputes are resolved in SFT's favor. *See Campos Enters., Inc.,* 1998–NMCA–131, ¶ 6, 125 N.M. 691, 964 P.2d 855. Frequently, there is an insufficient discovery record on a motion to dismiss for lack of personal jurisdiction for a court to reach a conclusion that a plaintiff has shown a prima facie case of conspiracy for personal jurisdiction to lie as to a particular defendant. *See Sanchez,* 115 N.M. at 663, 857 P.2d at 774.

{42} In the complaint, SFT alleged that each defendant to this appeal committed interference with prospective contractual relations and conspiracy to intentionally interfere. SFT specifically alleged that the SMS principals intentionally caused it to be dropped from the bidding team for its own economic benefit and "to get even with [SFT] for perceived grievances arising out of their previous employment and separation from [SFT]." Defendants' motions to dismiss for lack of personal jurisdiction and accompanying affidavits and memoranda do not respond to SFT's conspiracy allegations directly. We conclude that SFT has made a prima facie case of conspiracy with respect to the tort of intentional interference with prospective contractual relations, and we need not address the other individual torts set out in the complaint.

{43} Civil conspiracy is an agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Las Luminarias of the N.M. Council of the Blind v. Isengard,* 92 N.M. 297, 300, 587 P.2d 444, 447 (Ct.App.1978). The tort of intentional interference with prospective contractual relations requires a plaintiff to prove that a defendant "improperly interfered with the plaintiff's contractual relations, either through improper means or improper motive." *Diversey Corp. v. Chem–Source Corp.,* 1998–NMCA–112, ¶ 20, 125 N.M. 748, 965 P.2d 332. The purpose of this tort is to "impose liability for contractual interference when the means of interfering was not tortious or otherwise unlawful in itself." *Id.*

{44} Following discovery, SFT set forth the following facts through deposition evidence. In February 1999, Burns told DeNino that he and Jannetta were looking at SFT

alternatives. Burns forwarded to DeNino a Jannetta e-mail stating that Jannetta had spoken with NTS, a subsidiary of SMS, and that Jannetta suggested that they "could swap [SMS'] credentials with SFT's." A week later, Jannetta and Burns called Albuquerque and spoke with Nash and Musnitsky of SMS and set up a meeting in San Francisco. The principals of SMS were former members of SFT and present stockholders who had voted against the merger of SFT and Argus. The next day Burns discussed the "SMS option" with DeNino, informed him of the San Francisco meeting, and suggested that they substitute SMS for SFT in the bid proposal on March 1, 1999, and that " 'Jannetta would need to know if it will be SMS later this week.' " DeNino approved the San Francisco meeting, cautioning that SFT might sue. Following the failed San Francisco meeting and after a telephone call to Musnitsky in New Mexico, Jannetta and Burns sent Malewicz to Albuquerque to continue negotiations. On February 24, 1999, the letters of intent between Argus and SMS were signed, and SFT was notified of the merger agreement termination. Two days later, Jannetta told SFT that they were excluded from the federal bid itself. Argus and SMS swapped stock and retired some of SMS' bank debts in New Mexico. On March 1, 1999, SMS replaced SFT on the federal bid proposal, and the bid was submitted.

{45} Viewing the facts in the light most favorable to SFT, SFT has made a prima facie case of conspiracy for intentional interference with contractual relations. The facts presented in deposition testimony to the district court were sufficient to support reasonable inferences that an agreement existed among SMS, Burns, Jannetta, and DeNino to interfere with SFT's participation in the federal bid and that all parties knew that SFT would suffer economic injury in New Mexico. DeNino had approved the substitution of SMS, and SMS was aware of the deal between Argus and SFT because the SMS principals, prior principals in SFT and then current SFT shareholders, had been asked to vote on the merger, which they voted against. Indeed, Musnitsky's deposition testimony demonstrates the knowledge of SMS. Musnitsky testified that in February, when Argus contacted SMS, he "had been asked as [an SFT] stockholder to vote on a merger" between SFT and Argus and could "only think [the Argus–SFT deal] was in trouble if they're calling me."

{46} "A conspiracy may be established by circumstantial evidence; generally, the agreement is a matter of inference from the facts and circumstances, including the acts of the persons alleged to be conspirators." *Morris v. Dodge Country, Inc.,* 85 N.M. 491, 492, 513 P.2d 1273, 1274 (Ct.App. 1973). SFT is not required to prove this alleged conspiracy for personal jurisdiction purposes. We respectfully leave the merits of SFT's claims to the appropriate factfinder. *Cf. Stauffacher v. Bennett,* 969 F.2d 455, 459 (7th Cir.1992) (recognizing the difficulty that conspiracy theory of personal jurisdiction presents is that "it merges the jurisdictional issue with the merits").

{47} The contacts of SMS with New Mexico as a co-conspirator can be imputed to DeNino. All Defendants, except DeNino, have sufficient contacts with the state for the exercise of personal jurisdiction without conspiracy analysis as discussed above. Additionally, contacts by Malewicz imputed to Burns, Jannetta, Argus, and TL may also be imputed to DeNino by way of the conspiracy. We base jurisdiction over Defendants on their purposeful and concerted contacts with New Mexico, individually and together. As the court in *Stauffacher* stated, "[i]f through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction." *Id.* at 459. We agree and conclude that "traditional notions of fair play and substantial justice" are not offended by the exercise of personal jurisdiction over all Defendants by our New Mexico courts. *See Int'l Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154.

*Fiduciary Shield Doctrine*

{48} Jannetta argues in a footnote in his brief in chief that he, as an individual, is shielded from personal jurisdiction under the fiduciary shield doctrine. *See Allen v. Toshi-*

*ba Corp.,* 599 F.Supp. 381, 384 (D.N.M.1984). We do not agree.

**{49}** The fiduciary or corporate shield doctrine prevents a state from exercising personal jurisdiction over individual officers or directors of a corporation based on actions they have taken in a fiduciary capacity for the corporation. *Id.* However, inasmuch as New Mexico exercises personal jurisdiction to the full extent the constitution allows, *see United Nuclear Corp.,* 91 N.M. at 42, 570 P.2d at 306, the fiduciary shield doctrine is not constitutionally required in New Mexico. An employee of a corporation subject to personal jurisdiction will not be shielded from jurisdiction if he or she is a "primary participant[ ] in [the] alleged wrongdoing intentionally directed" at the forum state, which activities formed the bases of the jurisdiction over the corporation. *Calder,* 465 U.S. at 790, 104 S.Ct. 1482; *see also In re Application to Enforce Admin. Subpoenas Duces Tecum of the Sec. & Exch. Comm'n v. Knowles,* 87 F.3d 413, 418 (10th Cir.1996). Argus has sufficient minimum contacts with New Mexico to support personal jurisdiction over it as a corporation. Jannetta's actions on behalf of Argus were integral to this finding of jurisdiction. Jannetta was then a primary participant. The exercise over Jannetta as an individual is reasonable. *See id.* at 418.

*Arbitration*

**{50}** Concurrently with their other motions to dismiss, Defendants filed motions to compel arbitration pursuant to the Agreement, which the district court denied. On appeal, Defendants argue that SFT's claims fall within the broad reach of the arbitration clause as they "aris[e] out of or relat[e] to" the Agreement and, thus, should be arbitrated. We disagree and affirm the district court.

**{51}** Arbitration is a form of dispute resolution highly favored in New Mexico. *Spaw–Glass Constr. Servs., Inc. v. Vista De Santa Fe, Inc.,* 114 N.M. 557, 558, 844 P.2d 807, 808 (1992). It promotes both judicial efficiency and conservation of resources by all parties. *See Casias v. Dairyland Ins. Co.,* 1999–NMCA–046, ¶ 7, 126 N.M. 772, 975

P.2d 385; *see also K.L. House Constr. Co. v. City of Albuquerque,* 91 N.M. 492, 493–94, 576 P.2d 752, 753–54 (1978). New Mexico's then effective Uniform Arbitration Act, NMSA 1978, §§ 44–7–1 to –22 (1971), states that:

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Section 44–7–1. Thus, when parties have agreed to arbitrate, the courts must compel arbitration. *Pueblo of Laguna v. Cillessen & Son, Inc.,* 101 N.M. 341, 343, 682 P.2d 197, 199 (1984); *Bernalillo County Med. Ctr. Employees' Ass'n v. Cancelosi,* 92 N.M. 307, 308–09, 587 P.2d 960, 961–62 (1978). Whether the parties have agreed to arbitrate is a question of law; we review the applicability and construction of a provision requiring arbitration de novo. *Casias,* 1999–NMCA–046, ¶ 13, 126 N.M. 772, 975 P.2d 385; *Monette v. Tinsley,* 1999–NMCA–040, ¶ 7, 126 N.M. 748, 975 P.2d 361.

**{52}** As a contractual remedy, arbitration clauses are governed by contract law. *Casias,* 1999–NMCA–046, ¶ 11, 126 N.M. 772, 975 P.2d 385; *Christmas v. Cimarron Realty Co.,* 98 N.M. 330, 332, 648 P.2d 788, 790 (1982). A court will not rewrite a contract for the parties and, in its interpretation, the court will apply the plain meaning of the contract language. *Christmas,* 98 N.M. at 332, 648 P.2d at 790. "The terms of the agreement define the scope of the jurisdiction, conditions, limitations and restrictions on the matters to be arbitrated." *Id.* Therefore, the court's inquiry is whether the parties have agreed to arbitrate the matter under dispute. *See K.L. House Constr. Co.,* 91 N.M. at 494, 576 P.2d at 754. When a reasonable relationship between the subject matter of the dispute and the underlying agreement exists, the dispute is within the arbitration provision and should be arbitrated. *Id.*

{53} In this case, the Agreement provides that: "In the event of any breach, default, dispute, controversy, or claim arising out of or relating to this Agreement other than an action seeking preliminary or permanent injunctive relief, the Parties shall meet promptly through representatives with authority to resolve the dispute." Arbitration would be the "sole and exclusive remedy . . . respecting any dispute, protest, controversy, or claim arising out of or relating to this Agreement." As a result, our inquiry is whether SFT's claims "aris[e] out of or relat[e] to" the Agreement such that they are subject to arbitration.

{54} Defendants argue that the Agreement is broad enough to encompass SFT's claims in light of New Mexico's public policy favoring arbitration, and thus, arbitration is proper. They contend that SFT's own complaint demonstrates that its causes of action derive from the Agreement and that SFT's CEO Sangrey admitted that the two were related. Defendants argue that Sangrey's statements that the federal contract was the "principal objective of the plan to merge" and that "in all likelihood, the merger would not have gone through if the federal contract were not awarded to [SFT] or Argus" indicate that federal contract was "related to" the Agreement such that arbitration would apply to SFT's claims.

{55} Arbitration clauses such as the one before us are drafted with broad strokes and, as a result, require broad interpretation. Nonetheless, the scope of the clause itself is limited to the subject matter of the underlying contract. *See Christmas*, 98 N.M. at 332, 648 P.2d at 790; *K.L. House Constr. Co.*, 91 N.M. at 494, 576 P.2d at 754. Our review of the Agreement between SFT and Defendants reveals a contract describing a corporate merger, including stock exchange and warranties. The Agreement describes the potential business relationship and the conduct of the parties and sets out closing procedures. It consists of clauses describing stock transfers and warranties of the type that "[t]here are no PCBs or asbestos-containing materials located at or on Santa Fe's Facilities" and that SFT has complied with the Clean Air Act. It does not discuss the federal contract bid proposal or the parties' rights and responsibilities in its regard. When we hold SFT's claims up against the Agreement, we do not see overlap. SFT's claims that Defendants tortiously substituted another company and stole SFT's bid work for the federal contract do not implicate the rights and obligations set out by the Agreement. SFT's claims neither relate to the mechanics of the merger of two corporations nor arise from the performance or failure to perform the merger.

{56} Our case law requires a closer connection between the subject matter of the agreement and the subject matter of the dispute in question than that evinced in this case. In *K.L. House Construction Co.*, 91 N.M. at 494, 576 P.2d at 754, our Supreme Court concluded that an arbitration provision applied when the plaintiff had claims concerning a roof built pursuant to a construction contract containing an arbitration provision. The arbitration provision stated that "[a]ll claims, disputes and other matters in question arising out of, or relating to, this Contract" were subject to arbitration. *Id.* at 493, 576 P.2d at 753. The Court adopted the reasoning of a New York court, explaining that, in the evaluation of an arbitration provision, the inquiry is " 'whether the parties have agreed to arbitrate the particular dispute.' " *Id.* at 494, 576 P.2d at 754 (quoting *Nationwide Gen. Ins. Co. v. Investors Ins. Co.*, 37 N.Y.2d 91, 371 N.Y.S.2d 463, 332 N.E.2d 333, 335 (1975)). When the parties employ broad arbitration clauses, the subject matter of the underlying agreement determines the scope of the arbitration provision. *Id.* The Court thus concluded that, although warranty periods had expired, the plaintiff's claims regarding the roof were subject to arbitration as they had "a reasonable relationship to the subject matter of the contract." *Id.*; *see also Spaw–Glass Constr. Servs., Inc.*, 114 N.M. at 559, 844 P.2d at 809 (explaining that issue of whether a contractor was properly licensed had a reasonable relationship to the subject matter of construction contract and thus was subject to arbitration); *Monette*, 1999–NMCA–040, ¶¶ 21–22, 126 N.M. 748, 975 P.2d 361, (holding the plaintiffs' claim of misrepresentation concerning the defendants' employment obligation to one

plaintiff was subject to the arbitration provision of a manager-proprietor agreement, even though the alleged misrepresentations were made in anticipation of the agreement, unless the plaintiffs could claim fraud in the inducement).

{57} We deem it of utmost importance that the parties' Agreement does not state in an unlimited manner, as would be permitted by Section 44–7–1, that any disputes that may arise between the parties in the future shall be subject to arbitration. Instead, and more narrowly, it covers only those disputes arising out of or relating to the Agreement. Defendants' construct of the phrase "relate to" to include these claims gives it too broad an interpretation and goes beyond the agreement of the parties. *Cf. Breaker v. Corrosion Control Corp.*, 23 P.3d 1278, 1283–84 (Colo.Ct.App.2001) (explaining that arbitration provision of purchase agreement did not apply to claim of improper disclosure of confidential information under an employment agreement which was attached to the purchase agreement and the execution of which was an obligation arising out of the purchase agreement). SFT's claims do not "aris[e] out of or relat[e] to" the Agreement because no reasonable relationship between the two exists.

*Conclusion*

{58} We affirm the district court on all issues.

{59} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD, Judge and IRA ROBINSON, Judge.