**Certiorari Denied, September 20, 2012, No. 33,765**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number:  2012-NMCA-102**

**Filing Date: July 19, 2012**

**Docket No.  31,356**

**HARRY CLAY, individually and as**
**natural father of BRE CLAY and**
**AUSTIN CLAY, minor children,**

**Plaintiffs-Appellees,**

**v.**

**NEW MEXICO TITLE LOANS, INC.,**

**Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Raymond Z. Ortiz, District Judge**

Fine Law Firm
Mark Fine
Albuquerque, NM

for Appellees

Butt Thornton & Baehr PC
Emily A. Franke
Jane A. Laflin
Raúl P. Sedillo
Albuquerque, NM

for Appellant

**OPINION**

**BUSTAMANTE, Judge.**

**{1}**     New Mexico Title Loans, Inc. (Lender) appeals from the district court's denial of its

1

motion to compel arbitration. The district court ruled that (1) the arbitration clause is substantively unconscionable because it is against public policy and because the appeals clause unfairly benefits Lender over borrowers, and (2) the arbitration provision is ambiguous as to whether Chris "Harry" Clay's (Borrower) tort claims are subject to arbitration, and the provision is, therefore, unenforceable. We conclude that Borrower's tort claims are not within the scope of the arbitration provision and that the appeals clause is substantively unconscionable and, therefore, unenforceable. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

## I. BACKGROUND

### A. Factual Background

**{2}** On March 5, 2010, Borrower signed a loan agreement (Agreement) with Lender in which he agreed to pay $3,177.84 for a loan of $2400. He agreed to use his 1999 Dodge Ram truck as collateral to secure the loan. The Agreement included an arbitration provision purporting to apply to "any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement or the Motor Vehicle . . . securing this Agreement." Borrower did not pay back the loan when it was due on April 5, 2010. On the evening of May 21, 2010, two employees of Certified Adjusters attempted to repossess the truck on behalf of Lender. The parties dispute the details of the encounter but not the two essential facts: (1) Borrower resisted Certified Adjusters' attempts to take the vehicle; and (2) one of Certified Adjusters' employees, Ryan Browning, shot Borrower while Borrower's daughter watched. As a result, Borrower is unable to walk.

### B. Procedural Background

**{3}** Borrower filed a twelve-count complaint against Lender, Certified Adjusters, and Ryan Browning, alleging tort claims including negligence per se, negligent hiring and retention, breach of duty during ultra-hazardous activity, loss of consortium, negligent infliction of emotional distress, and breach of non-delegable duty. He also alleged breach of contract by Lender. After providing written notice of intent to compel arbitration, Lender filed a motion and memorandum to stay litigation and compel arbitration in district court. The district court found that the arbitration provision in the Agreement was substantively unconscionable, "both as a matter of public policy and due to an impermissible 'escape hatch' clause" and, therefore, unenforceable. It also found, in the alternative, that the applicability of the arbitration provision to Borrower's claims was ambiguous. Since it was ambiguous, the district court "[c]onstru[ed], as it must, this ambiguity against the drafter of the contract, [Lender, and found] that [Borrower's] allegations do not fall within the scope of the arbitration provision."

## II. DISCUSSION

**{4}** Borrower argues that the arbitration provision in the Agreement is both substantively

and procedurally unconscionable because the terms are unreasonably unfair, there was fraud in the inducement, and there was a gross disparity in bargaining power between Borrower and Lender. He asserts further that, even if it were not unconscionable, his claims do not fall within the scope of the arbitration provision. Lender contends that the arbitration provision is not unconscionable because it is not "illegal, contrary to any public policy, or unreasonably favorable to [Lender]." Lender also argues that the plain language of the provision encompasses all of Borrower's theories of recovery and, therefore, the district court erred in finding ambiguity.

## A.    Standard of Review

**{5}**    "We apply a de novo standard of review to a district court's denial of a motion to compel arbitration." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 11, 146 N.M. 256, 208 P.3d 901. "As contracts, [w]e consider [arbitration agreements] as a whole to determine how they should be interpreted." *Medina v. Holguin*, 2008-NMCA-161, ¶ 8, 145 N.M. 303, 197 P.3d 1085 (alterations in original) (internal quotation marks and citation omitted). "[I]t is established law that our appellate courts will affirm a district court's decision if it is right for any reason, so long as the circumstances do not make it unfair to the appellant to affirm." *Cordova*, 2009-NMSC-021, ¶ 18.

## B.    Analysis

**{6}**    Arbitration is a "highly favored" form of dispute resolution. *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 2002-NMCA-030, ¶ 51, 131 N.M. 772, 42 P.3d 1221; *see* 9 U.S.C. § 2 (1947); NMSA 1978, §§ 44-7A-1 to -32 (2001) (Uniform Arbitration Act). "It promotes both judicial efficiency and conservation of resources by all parties." *Santa Fe Techs., Inc.*, 2002-NMCA-030, ¶ 51; *see Cordova*, 2009-NMSC-021, ¶ 30.

**{7}**    The purpose of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-6 (2006), was to combat "widespread judicial hostility to arbitration agreements." *AT & T Mobility LLC v. Concepcion*, ___ U.S. ___, ___, 131 S. Ct. 1740, 1745 (2011). Section 2 of the FAA provides that

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 2 creates a presumption favoring arbitration. "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract

language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* at 24-25. A dispute as to whether there is a binding arbitration agreement, however, obviates that presumption. *DeArmond v. Halliburton Energy Servs., Inc.*, 2003-NMCA-148, ¶ 8, 134 N.M. 630, 81 P.3d 573.

**{8}** In spite of these presumptions, construction of arbitration provisions proceeds along typical contract interpretation avenues. "We have described [Section 2] as reflecting both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract. In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms[.]" *Concepcion*, ___ U.S. at ___, 131 S. Ct. at 1745 (internal quotation marks and citations omitted). "Equal footing" means that, Section 2 of the FAA notwithstanding, arbitration provisions are not given any special deference or treatment not accorded other contract terms. *See Fiser v. Dell Computer Corp.*, 2008-NMSC-046, ¶ 23, 144 N.M. 464, 188 P.3d 1215. State law limitations specific to arbitration provisions are preempted by the FAA. *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 688 (1996) (stating that "Montana's law plac[ing] arbitration agreements in a class apart from any contract, and singularly limit[ing] their validity" conflicts with the Act and is, therefore, preempted (internal quotation marks omitted)). Arbitration provisions are, however, subject to state law "*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. Thus, generally applicable contract defenses . . . may be applied to invalidate arbitration agreements without contravening [Section] 2." *Id.* at 686-87 (internal quotation marks and citations omitted).

**{9}** The questions before us are whether the arbitration provision or any part thereof is substantively or procedurally unconscionable and whether Borrower's claims fall within the scope of the provision. Because we think the latter issue is potentially dispositive, we address it first.

**1. Scope of the Arbitration Provision**

**a. Arbitrability**

**{10}** We start with a basic preliminary question: Who decides whether an issue is arbitrable under the agreement? Generally, questions of arbitrability are within the purview of a court. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *see* § 44-7A-7(b) ("The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."). If the parties have "clearly and unmistakably" agreed that this issue is subject to arbitration, however, the reviewing court must enforce that agreement without further inquiry. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see Felts v. CLK Mgmt., Inc.*, 2011-NMCA-062, ¶ 18, 149 N.M. 681, 254 P.3d 124 (stating that an agreement to arbitrate the issue of arbitrability is "an additional, antecedent agreement . . . and the FAA operates on this additional arbitration agreement just as it does on any other." (internal quotation marks and citation omitted)), *cert. granted*,

4

2011-NMCERT-006, 150 N.M. 764, 266 P.3d 633. The Court uses "ordinary state-law principles that govern the formation of contracts" to determine whether the parties clearly and unmistakably agreed to arbitrate an issue, including arbitrability. *Felts*, 2011-NMCA-062, ¶ 18 (internal quotation marks and citation omitted).

**{11}** When there is an agreement to arbitrate arbitrability, also called a "delegation provision," "a party must specifically challenge the delegation provision in order for a court to consider the challenge rather than referring the matter to an arbitrator." *Id.* ¶ 20. The challenge need not be made in a specific document, such as the complaint; rather, "[w]hat matters is the substantive basis of the challenge." *Id.* ¶ 29 (internal quotation marks and citation omitted). Our inquiry, then, turns on two questions: (1) was there a clear and unmistakable agreement to arbitrate arbitrability? and (2) did Borrower mount a "specific challenge" to that agreement? If the answer to both of these questions is yes, the court, rather than an arbitrator, may determine whether the parties agreed to arbitrate the issue at hand.

**{12}** In this case, the arbitration provision states:

> (b) *What Claims Are Covered*: "Claim" means any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement or the Motor Vehicle . . . securing this Agreement. . . . it also includes disputes about the *validity, enforceability, arbitrability or scope of this Arbitration Provision* or this Agreement.

(Emphasis added.) In *Felts*, the Court held that an arbitration clause that covered "any and all claims . . . arising out of [the] agreement, including disputes as to the matters subject to arbitration" was clear and unmistakable evidence of the parties' intent to "have an arbitrator decide threshold issues of arbitrability." *Id.* ¶¶ 21, 23 (alteration and internal quotation marks omitted). The language in the arbitration clause in this case is even more clear than in *Felts*, since it specifies disputes about the "validity, enforceability, arbitrability or scope" of the clause.

**{13}** Borrower sufficiently challenged the delegation provision in the Agreement. He argues that there was fraud in the inducement based on alleged misrepresentation by Lender of the neutrality of the two organizations identified to administer the arbitration proceedings and the fact that both organizations, the National Arbitration Forum (NAF) and the American Arbitration Association (AAA), had stopped administering arbitration of collections. Borrower maintains that he relied on that representation of neutrality and his reliance was justifiable. In *Felts*, the plaintiff made a similar argument: she argued, *inter alia*, that the delegation clause was "rendered impossible . . . because the NAF had ceased its consumer arbitration business." *Id.* ¶ 30. There, the Court held that this was a "specific challenge to the delegation clause" and, therefore, the plaintiff had met her burden to challenge the threshold issue. *Id.* In keeping with *Felts*, we conclude that Borrower has challenged the delegation provision.

5

**b.      Borrower's Tort Claims Are Not Within the Scope of the Agreement**

**{14}**    We turn now to whether Borrower's claims fall within the scope of the arbitration agreement.  We start with the framework used to determine the scope of such an agreement.  The general rule was set out in the 1960s by the United States Supreme Court in the *Steelworkers Trilogy*:  *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960).  That rule is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT & T Techs., Inc.*, 475 U.S. at 648 (internal quotation marks and citation omitted).  Under contract law, the scope of an arbitration provision—whether the parties intended to submit to arbitration—is determined by "apply[ing] the plain meaning of the contract language."  *Santa Fe Techs., Inc.*, 2002-NMCA-030, ¶ 52.  The terms of the agreement itself "define the scope of . . . the matters to be arbitrated."  *Christmas v. Cimarron Realty Co.*, 98 N.M. 330, 332, 648 P.2d 788, 790 (1982).  More specifically, although "[a]rbitration clauses . . . drafted with broad strokes . . . require broad interpretation, . . . the scope of the clause itself is limited to the subject matter of the underlying contract."  *Santa Fe Techs., Inc.*, 2002-NMCA-030, ¶ 55.  In order to fall within the scope of the arbitration clause, the claims at issue must bear a "reasonable relationship" to the contract in which the arbitration clause is found.  *See id.* ¶ 52 ("When a reasonable relationship between the subject matter of the dispute and the underlying agreement exists, the dispute is within the arbitration provision and should be arbitrated.").

**{15}**    The gist of Borrower's allegations is that Lender "intentionally or recklessly hired [the] co-defendants to enforce their security interest[s]" without appropriate oversight or review of their licensure or expertise.  The complaint focuses on the conduct of Certified Adjusters on May 21, 2010, when they attempted to repossess Borrower's truck and on Lender's hiring and oversight of Certified Adjusters.  Borrower maintains that Lender is vicariously liable under several theories for the consequences of the shooting because Certified Adjusters was working on Lender's behalf.  There are no claims in the complaint pertaining to the loan itself, payments, fees, or other matters addressed in the Agreement.

**{16}**    The "Loan Agreement, Promissory Note and Security Agreement" signed by Borrower and Lender has thirteen clauses.  The preamble to these clauses indicates the names of the lender and borrower, the amount borrowed, the finance charges, annual percentage rate, total payments, fees, the vehicle offered as collateral, and payment schedule.  Clauses one through twelve address the parties' responsibilities with respect to payments, interest rates, finance charges, renewals, warranties, notices, governing law, the collateral, and New Mexico Small Loan Act disclosures.  *See* NMSA 1978, § 58-15-14.1 (2007).  Viewed more broadly, the overall purpose of the Agreement is to formalize the arrangements to provide funds to Borrower and to earn interest and fees for Lender in exchange for the loan.  *See* Nathalie Martin & Ozymandias Adams, *Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 Mo. L. Rev. 41, 58 (2012); *see generally*

6

New Mexico Title Loans, http://www.clamex.com.

**{17}** Clause thirteen is titled "ARBITRATION PROVISION." The provision states, in relevant part:

> "Claim" means any claim, dispute or controversy between you and us that in any way *arises from or relates to this Agreement or the Motor Vehicle . . .* securing this Agreement ("Vehicle"). "Claim" has the *broadest possible meaning*, and includes initial claims, counterclaims, cross-claims and third-party claims. It includes disputes based upon *contract, tort, consumer rights, fraud and other intentional torts*, constitution, statute, regulation, ordinance, common law and equity (including any claim for injunctive or declaratory relief). Subject to [a clause regarding class action claims], it also includes disputes about the validity, enforceability, arbitrability or scope of this Arbitration Provision or this Agreement. However, "Claim" does not include: (I) our right to enforce our security interest and to obtain possession of the Collateral by seeking a replevin judgment or by using self-help, provided such an action seeks only possession of the Collateral and not a personal monetary judgment against you, or (ii) any individual action in court by one party that is limited to preventing the other party from using a self-help remedy and that does not involve a request for damages or monetary relief of any kind.

(Emphasis added.)

**{18}** We note that, although Lender argues that the arbitration provision is broad and applies to "any claim," in fact the scope of the provision is limited in several ways. (1) The provision applies only to matters that "aris[e] from or relat[e] to" the Agreement or the collateral. *See Santa Fe Techs., Inc.*, 2002-NMCA-030, ¶ 57 ("We deem it of utmost importance that the parties' [a]greement does not state in an unlimited manner, . . . that any disputes that may arise between the parties in the future shall be subject to arbitration. Instead, and more narrowly, it covers only those disputes arising out of or relating to the [a]greement."). (2) Lender specifically excluded its "right to enforce [its] security interest and to obtain possession of the Collateral by seeking a replevin judgment or by using self-help." (3) The "Arbitration Provision is not applicable to 'small claims' meaning those claims that either party is entitled to file and maintain in an appropriate small claims court, or your State's equivalent." Thus, by its plain terms, the provision does not apply to any and all claims that might arise between Lender and Borrower.

**{19}** Lender urges us to conclude from the emphasized language in the arbitration provision that "[t]he terms [of the provision] encompass 'any claim' whether sounding in tort or contract." Lender argues that, since this language is "clear and unambiguous" and not "contrary to public policy or unreasonably unfair," the district court should have applied the *Moses H. Cone* presumption and resolved the matter in favor of arbitration. *See* 460 U.S.

7

at 24-25. We are not persuaded for two reasons. First, the presumption applicable in *Moses H. Cone* does not apply when the parties dispute the existence of an arbitration agreement. *See DeArmond*, 2003-NMCA-148, ¶ 8. Furthermore, "[t]he presumption in favor of arbitration cannot operate to compel arbitration of a particular claim in the absence of an agreement to arbitrate a particular claim." *Heimann v. Kinder-Morgan CO2 Co., L.P.*, 2006-NMCA-127, ¶ 25, 140 N.M. 552, 144 P.3d 111.

**{20}** Second, as discussed, the agreement to arbitrate an issue depends on the intent of the parties. *See AT & T Techs., Inc.*, 475 U.S. at 648. A party may be assumed to have intended to arbitrate issues that are closely related to those governed by the agreement itself, but not those that are unrelated to the agreement, out of the context of the agreement, or outrageous and unforeseeable. A review of cases in this and other jurisdictions illustrates this principle.

**{21}** In *Santa Fe Tech., Inc.*, Argus Networks and Santa Fe Technologies planned to compete for a federal contract opportunity together and entered into an agreement to merge once the contract was won. 2002-NMCA-030, ¶ 4. After Argus Networks replaced Santa Fe Technologies with a different subcontractor on the bidding team and, ultimately, won the contract, Santa Fe Technologies filed a complaint alleging "interference with prospective contractual relations, usurpation of business opportunity, fraud, and conspiracy to commit the aforementioned torts, among other claims." *Santa Fe Techs., Inc.*, 2002-NMCA-030, ¶¶ 8-11. Argus Networks claimed that the merger agreement between the two parties mandated arbitration of these claims because the merger was predicated on winning the contract and, therefore, the merger agreement was "related to" the federal contract. *Id.* ¶ 54. The Court disagreed, stating that "[w]hen we hold [Santa Fe Technologies'] claims up against the [a]greement, we do not see overlap." *Id.* ¶ 55. In that case, the agreement pertained solely to the merger of the two companies, not to the federal contract opportunity for which the parties had agreed to collaborate. *Id.* ¶¶ 4-10, 55. The Court stated that Santa Fe Technologies "claims neither relate to the mechanics of the merger . . . nor arise from the performance or failure to perform the merger" and that a "closer connection" was required in order to compel arbitration. *Id.* ¶¶ 55-56; *see Campos v. Homes By Joe Boyden, L.L.C.*, 2006-NMCA-086, ¶ 13, 140 N.M. 122, 140 P.3d 543 (stating claims of misrepresentation regarding open space behind a house were not subject to arbitration pursuant to an arbitration clause in the warranty agreement provided by the seller/builder because the claims arose in a different context than the warranty); *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995) (holding that it would be "absurd" to require arbitration of claims not "touching specified provisions" of the underlying contract and that the existence of a contract between the parties was not sufficient to compel arbitration).

**{22}** We find the reasoning in *Aiken v. World Fin. Corp. of South Carolina*, 644 S.E.2d 705 (S.C. 2007), most persuasive. The plaintiff, Mr. Aiken, obtained several loans from World Finance Corporation. *Id.* at 707. In his loan applications, he provided private information, including his social security number and date of birth. *Id.* Two years after Mr. Aiken paid off the last loan, employees at World Finance Corporation used his personal information to "obtain sham loans and embezzle the proceeds for the employees' personal

8

benefit." *Id.* Each loan agreement signed by Mr. Aiken contained a broad arbitration clause:

> All disputes, controversies or claims of any kind and nature between lender and borrower arising out of or in connection with the loan agreement, or arising out of any transaction or relationship between lender and borrower or arising out of any prior or future dealings between lender and borrower, shall be submitted to arbitration and settled by arbitration.

*Id.* at 707 (emphasis omitted); *see id.* at 708 n.2 (characterizing this clause as "broad"). World Finance Corporation sought to compel arbitration of Mr. Aiken's claims for "outrage and emotional distress, negligence, negligent hiring/supervision, and unfair trade practices" on grounds that they were within the scope of the arbitration agreement because the loan agreements "gave the conspirators access to Aiken's information in order to carry out their crimes." *Id.* at 707-08. The South Carolina Supreme Court rejected this argument, stating, "[a]pplying what amounts to a 'but-for' causation standard essentially includes every dispute imaginable between the parties, which greatly oversimplifies the parties' agreement to arbitrate claims between them. Such a result is illogical and unconscionable." *Id.* at 708. The court went on to hold that "[t]he mere fact that the dispute would not have arisen but for the existence of the contract . . . is insufficient by itself to transform a dispute into one arising out of or relating to the agreement." *Id.* (internal quotation marks and citation omitted). Most significantly, the South Carolina Supreme Court announced a "definitive rule" that "[b]ecause even the most broadly-worded arbitration agreements still have limits founded in general principles of contract law, this Court will refuse to interpret any arbitration agreement as applying to outrageous torts that are unforeseeable to a reasonable consumer in the context of normal business dealings." *Id.* at 709. Applying these principles, the court held that Mr. Aiken's claims were not subject to the arbitration clause because, by signing the loan agreement, he "could not possibly have been agreeing to provide an alternative forum for settling claims arising from this wholly unexpected tortious conduct." *Id.*

**{23}**    The court was careful to clarify that it "[did] not seek to exclude all intentional torts from the scope of arbitration." *Id.* Rather, tort claims that alleged a breach of the underlying contract would fall within the scope of an arbitration agreement because they fall "within the contemplation of the parties in agreeing to arbitrate." *Id.* It limited its ruling to "those outrageous torts, which although factually related to the performance of the contract, are legally distinct from the contractual relationship between the parties." *Id.*

**{24}**    Here, Borrower signed an affidavit stating that he did not intend to agree to arbitrate claims such as those arising from the shooting during repossession of his truck. We do not need to rely on Borrower's affidavit, however, to conclude that he did not intend for these claims to be arbitrable. Rather, as in *Santa Fe Techs., Inc.*, *Campos*, and *Aiken*, the terms of the Agreement provide the context in which the arbitration provision will be interpreted. The plain language of the Agreement reflects a business arrangement between Borrower and Lender for the loan of funds in exchange for fees and interest. It is reasonable that Borrower

9

understood the arbitration provision to apply to matters related to fees, finance charges, payments, renewals, warranties, notices, and so on. Even if Borrower intended to submit to arbitration disputes related to the collateral (clause 4) or default (clauses 7 and 8), it is not reasonable to conclude that he intended to give up his right to a jury trial if he was shot during the repossession. *See Rogers-Dabbs Chevrolet-Hummer, Inc. v. Blakeney*, 05-IA-00125-SCT, 950 So.2d 170, 176 (Miss. 2007) (agreeing with the plaintiff's argument that "no consumer in an arms-length negotiation, absent duress, would contract away his constitutional rights to judicial redress and a jury trial when making a purchase if he believed it gave the merchant the green light to commit fraud, forgery, and identity theft, while at the same time precluding the consumer from having his day in court").

**{25}** The only underlying fact common to both the Agreement and most of the claims at issue is the existence of the contract including provisions for repossession of the vehicle on default. With the exception of Borrower's claim of breach of contract, addressed below, none of his claims address other terms of the Agreement. The fact that the Agreement provided for repossession does not bring Borrower's claims within the arbitration provision. As stated in *Coors* and *Aiken*, the mere existence of a contract between the parties is insufficient to subject these claims to the arbitration provision. Here, the facts are similar to those in *Aiken*. In that case, Mr. Aiken agreed voluntarily to provide personal information as part of the loan process; the court held that the *illegal* use of that information was outside of the scope of the arbitration provision. *Aiken*, 644 S.E.2d at 707, 709. Similarly, Borrower agreed voluntarily that repossession was a valid remedy for Lender in the Agreement. Illegal or negligent conduct during repossession, however, is outside the scope of this agreement and, therefore, the arbitration provision as well.

**{26}** Count V of Borrower's complaint alleges that Lender breached the contract because the Agreement provided for repossession of the collateral "according to law," and Lender failed to conduct or ensure that Certified Adjusters conducted the repossession of his truck in accordance with NMSA 1978, Section 55-9-609(b)(2) (2001) (repossession attempt must not breach the peace) and NMSA 1978, Section 61-18A-5(B) (1993) (a valid license is required to attempt repossession). We agree with the *Aiken* reasoning that a claim that is dependent on the underlying contract itself is within the scope of the arbitration provision. 644 S.E.2d at 709; *accord Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1198 (10th Cir. 2009) (stating that in assessing whether a matter is arbitrable, "we evaluate the factual underpinnings of the complaint rather than merely considering the labels attached to each of the causes of action it contains").

**{27}** Finally, we note that the district court ruled that the arbitration provision was ambiguous as to whether it addressed Borrower's claims and, construing that ambiguity against the drafter of the Agreement, denied the motion to compel arbitration. *See Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 19, 131 N.M. 100, 33 P.3d 651 ("[W]e strictly construe a contract against the party who drafted the contract in order to protect the rights of the party who did not draft it."). As discussed, we conclude that the scope of the provision is not ambiguous.

**{28}** In conclusion, we hold that claims based on conduct that is unforeseeable to the parties at the time of entering into an agreement including an arbitration provision are not within the scope of the provision as a matter of contract law. With the exception of his breach of contract claim, Borrower's claims are not subject to the arbitration provision.

## 2.    Substantive Unconscionability

**{29}** We turn next to whether the arbitration provision or a portion thereof is substantively unconscionable. Because we agree with the district court that the appeals clause is substantively unconscionable, but disagree that the entire provision is unenforceable, we examine the issue in detail and affirm in part and reverse in part.

**{30}** Borrower also asserts that the arbitration provision is procedurally unconscionable and the result of fraud in the inducement. Because we determine that Borrower's claims are outside the scope of the Agreement and that the appeals clause of the arbitration provision is substantively unconscionable, and because Borrower provides no serious support for these arguments, we see no need to address them.

**{31}** "Unconscionability is an equitable doctrine, rooted in public policy, which allows courts to render unenforceable an agreement that is unreasonably favorable to one party while precluding a meaningful choice of the other party." *Cordova,* 2009-NMSC-021, ¶ 21. Unconscionability can be found through both procedural and substantive analyses. *Id.* The former "examines the particular factual circumstances surrounding the formation of the contract," whereas the latter is concerned with "the legality and fairness of the contract terms themselves." *Id.* ¶¶ 22-23. An agreement may be unconscionable, and therefore unenforceable, based on one or both of these analyses. *Id.* ¶ 24.

**{32}** Borrower argues that the arbitration provision is substantively unconscionable, because "the 'escape hatch' appeal clause is grossly unfair." The district court found that the "impermissible escape hatch" clause rendered the provision unconscionable, and that the provision was unconscionable "as a matter of public policy."

**{33}** "Contract provisions that unreasonably benefit one party over another are substantively unconscionable." *Id.* ¶ 25. To assess unconscionability, we examine whether "the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns." *Id.* ¶ 22. An "escape hatch" clause is one that allows a party to avoid arbitration or an arbitration decision because it provides for appeal of a final arbitrated decision, reserves rights to judicial remedies for certain claims for one party, or allows alteration of the arbitration provision retroactively by one party. *See Padilla v. State Farm Mut. Auto. Ins. Co.*, 2003-NMSC-011, ¶ 2, 133 N.M. 661, 68 P.3d 901; *Cordova*, 2009-NMSC-021, ¶ 25; *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 206 (5th Cir. 2012). Escape hatch clauses may be acceptable if "truly equal in their effect on the parties." *Padilla*, 2003-NMSC-011, ¶ 10. Borrower contends that the escape hatch clause in Lender's arbitration provision unfairly benefits

11

Lender over him because it provides for appeals only when the amount of a claim exceeds $100,000 or grants or denies any claim for injunctive relief. We start by assessing whether the clause unfairly benefits one party over the other. *See Cordova*, 2009-NMSC-021, ¶ 21. We determine that it does.

**{34}** The clause in question reads as follows:

> The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA. However, if the amount of the Claim exceeds $100,000 or grants or denies any claim for injunctive relief, any party can appeal the award to a three-arbitrator panel administered by the Administrator which shall reconsider any aspect of the initial award requested by the appealing party.

Borrower contends that the clause is unfairly one-sided because, although it allows for appeals of claims over $100,000 by both parties, Lender is more likely to appeal a claim that meets this threshold. He contends that *Padilla* is controlling here. In *Padilla*, the Court held that a clause that provided for appeal of an arbitration decision only when the claim exceeded the minimum liability coverage required by the Mandatory Financial Responsibility Act (MFRA), NMSA 1978, §§ 66-5-201 to -239 (1978, as amended through 2001), was unconscionable. *See Padilla*, 2003-NMSC-011, ¶ 2. The Court held that "[a]lthough facially equal, such escape hatch clauses are not truly equal . . . because both parties are bound by a low award, when an insurance company is unlikely to appeal, and not bound when there is a high award, when an insurance company is more likely to appeal." *Id.* ¶ 10. The Court was concerned that the provision would have a "chilling effect" on an insured's rights under the MFRA, the purpose of which was to "plac[e] the insured in the same position for the recovery of damages as he or she would have been in had the tortfeasor carried liability insurance." *Id.* ¶¶ 11-12. Thus, the Court's decision rested on both unfairness and public policy grounds. *See id.* ¶¶ 10, 13.

**{35}** We agree with Borrower that the clause in question here is analogous to that in *Padilla*. There, as here, the arbitration provision reserves the right of appeal to claims above a certain amount at which the drafter of the provision is more likely to appeal than the consumer. The benefit to the drafter is apparent: small claims, over which it is unlikely to initiate proceedings anyway, are required to be arbitrated, whereas it is free to litigate large claims in any way it chooses. Although the consumer also has this option, the consumer's claims are more likely to fall below the threshold and, therefore, be subject to arbitration only. The arbitration provision's "escape hatch" clause is unfair because it benefits the lender more than the borrower.

**{36}** Lender argues that *Padilla* is not controlling because Borrower had the option to reject arbitration entirely within fifteen days of the date of signing the Agreement and because the decision was based on policy grounds not present here. The arbitration provision included a "right to reject" clause through which Borrower had the option to reject

12

the arbitration provision in its entirety by "mailing [Lender] a written rejection notice . . . within fifteen (15) days after the date of [the] Agreement." Lender argues that this "right to reject" prevented the unfairness found in *Padilla*. Borrower counters that the "right to reject" clause does not overcome the unfairness in the terms because (1) a borrower is unlikely to exercise this right, or (2) it is illusory. We agree with Borrower that, in the context of a title loan agreement arbitration provision, a borrower prepared to pay 360% annual percentage rate and over $700 in fees for a $2400 loan is unlikely to exercise the "right to reject," particularly when it cannot be done as an option within the Agreement itself but instead must be done in a separate writing. (We note that the Agreement included an "optional" fee of $17. It is not clear how a borrower would exercise the apparent ability to opt out of this fee, but the fact that it is noted as "optional" on the form itself demonstrates that Lender, at least theoretically, was aware of ways to allow borrowers to exercise a "right to reject" at the time of signing.).

**{37}**   These arguments by the parties, however, miss the point. Although the relative unlikelihood of Borrower exercising the right to reject (in fact, he did not reject it) is important to an assessment of the fairness of the arbitration provision overall, in the context of the "escape hatch" clause analysis it is insignificant. This is because it is the clause itself that limits Borrower's choices. The clause that formed the basis for the district court's decision is focused on the *choices available to the parties on appeal*. It is precisely because the clause limits Borrower's options while not limiting those of Lender to the same degree that the clause is unconscionable.

**{38}**   To the extent that Lender argues that *Padilla* is not controlling because its holding was based on policy arguments specific to the MFRA, we disagree. The *Padilla* Court noted that it was the essential unfairness of the terms that was contrary to public policy behind the MFRA. *See Padilla*, 2003-NMSC-011, ¶ 10. Therefore, *Padilla* is not distinguishable from this case on grounds that it is limited to motor vehicle insurance cases. Furthermore, in *Cordova*, the Court applied the *Padilla* holding in the loan agreement context to conclude that the defendant's "one-sided arbitration provisions" were unconscionable because they were "so unfairly and unreasonably one-sided that [they are] substantively unconscionable." *Cordova*, 2009-NMSC-021, ¶ 32.

**{39}**   We note that the Agreement bears another resemblance to that in *Cordova*. In *Cordova*, the contract term on which the case turned was a paragraph not included in the arbitration provision. *Id.* ¶¶ 3-4. In addition to the "broadly stated" arbitration provision, that paragraph provided for the lender's remedies in case of default by the borrower. *Id.* Under that clause, the lender reserved its "remedies in an action at law or in equity, including but not limited to, judicial foreclosure or repossession. [The l]ender may also exercise its other remedies provided by law (such as, . . . the right of self-help repossession under Article 9 of the Uniform Commercial Code.)" *Id.* ¶ 4 (internal quotation marks omitted). Under this clause, in spite of the arbitration provision, "the lender alone had the exclusive and unlimited alternative to seek any judicial remedies it might otherwise have available to it in law or in equity." *Id.* Although neither Borrower nor Lender raise this issue, the Agreement contains

13

an arbitration provision similar to that in *Cordova*. Under the clause, in the event of default, Lender may "foreclose upon its lien and liquidate any [c]ollateral . . . according to law, including by using self-help repossession [and] exercise all other rights, powers and remedies given by law." This clause is not as broadly worded as the clause in *Cordova*, nor as specific regarding the judicial remedies reserved. *See id.* Nevertheless, this clause reinforces Lender's exclusion of repossession from the definition of a "claim" and appears to reserve to it rights not available to Borrower.

**{40}** Finally, the parties disagree as to the appropriate remedy for unconscionability of the appeal clause. Lender argues that we must follow *Padilla*, where the unconscionable clause was severable, leaving the remainder of the provision intact. Borrower argues that the entire arbitration provision must be struck under *Cordova*. When a term is unconscionable, a court "may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result." *Padilla*, 2003-NMSC-011, ¶ 15 (internal quotation marks and citation omitted). The critical determination is whether a term is "central to the arbitration scheme and cannot be severed without substantially altering the method of dispute resolution contractually agreed on by the parties." *Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 56, 150 N.M. 398, 259 P.3d 803. In *Padilla*, the Court held that an appeal provision was severable because it governed "only a post-award proceeding, not the general conduct of the arbitration itself." 2003-NMSC-011, ¶ 18 (internal quotation marks and citation omitted). In contrast, in *Cordova*, the Court held that the default clause was not severable because the "invalidity . . . involves the arbitration scheme itself, not just the procedures for appeal." 2009-NMSC-021, ¶ 40.

**{41}** We agree with Lender that the "escape hatch" clause at issue here is severable because it addresses post-arbitration rights, not the conduct of arbitration itself. We hold, therefore, that the appeal clause is severable, unconscionable, and unenforceable. The remainder of the arbitration provision is unchanged. Because the appeal clause is severable, we reverse the district court's ruling that the entirety of the arbitration clause is unconscionable and unenforceable.

### 3.    Order in Which Claims Should Proceed

**{42}** Having concluded that the arbitration provision is unchanged except for the appeals clause, we turn now to address the order in which claims should proceed. When some claims are arbitrable and others not, as here, the question is whether and in what order the claims should proceed. *Chelsea Family Pharmacy*, 567 F.3d at 1200. Federal and state policies favoring arbitration require that we "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation[.]" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Assuming under this rule that the breach of contract claim is required to be arbitrated, there remains a question as to whether the nonarbitrable claims must be stayed pending resolution of that claim. *Chelsea Family Pharmacy*, 567 F.3d at 1200. "Stay of the entire proceeding is appropriate when resolution of the arbitrable claim will have a

preclusive effect on the nonarbitrable claim or when the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Id.* (internal quotation marks and citation omitted); *see Rex, Inc. v. Manufactured Hous. Comm. of N.M.*, 119 N.M. 500, 505, 892 P.2d 947, 952 (1995) (holding that collateral estoppel applies to arbitration decisions when the arbitration proceedings allowed "presentation of evidence and argument substantially similar in form and scope to judicial proceedings" (internal quotation marks and citation omitted)).

**{43}** In evaluating on appeal the question of whether nonarbitrable claims should be stayed pending resolution of arbitrable claims, courts have taken two paths. In some cases, the appellate court made a determination as to which claims should be stayed. *See Chelsea Family Pharmacy*, 567 F.3d at 1200 ("Because the two claims in this case are distinct and unrelated, [the plaintiff's] arbitrable . . . claim cannot have a preclusive effect on the nonarbitrable . . . claim; one does not 'predominate' over the other. [I]t would be inappropriate to stay the [nonarbitrable] claim pending resolution of the [arbitrable] claim."). In other cases, the appellate court remanded to the district court for "determination of whether a resolution of [the] arbitrable claims will have a preclusive effect on the nonarbitrable claims that remain subject to litigation." *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 785 (10th Cir. 1998).

**{44}** Here, the arbitrable claim does not predominate the lawsuit; it is only one of twelve claims. Whether the breach of contract claim may have a preclusive effect on the other claims, however, is not as clear-cut. Applicability of collateral estoppel requires factual findings that "(1) the party against whom collateral estoppel is asserted must have been a party in . . . the original action; and (2) the two cases must have concerned the same ultimate issue or fact, which was (a) actually litigated, and (b) necessarily determined in the first suit." *DeLisle v. Avallone*, 117 N.M. 602, 605, 874 P.2d 1266, 1269 (Ct. App. 1994). Furthermore, because arbitration proceedings often have limited "procedural safeguards, the court should be particularly vigilant in examining whether the arbitration proceeding provided the parties with a full and fair opportunity to litigate the issues." *Rex*, 119 N.M. at 505, 892 P.2d at 952. The district court is in the best position to hear argument and make factual findings on these issues. *See Wood v. Millers Nat'l Ins. Co.*, 96 N.M. 525, 529, 632 P.2d 1163, 1167 (1981) (discussing the district court's balancing of judicial economy and the rights of the parties with respect to a stay). Therefore, we remand to the district court for determination of whether nonarbitrable claims should be stayed pending resolution of arbitrable claims.

## III. CONCLUSION

**{45}** We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion. The district court's ruling as to the scope of the arbitration provision is affirmed as to all claims except the breach of contract claim. With the exception of his breach of contract claim, Borrower's claims are not subject to the arbitration provision of the Agreement because they are not within the scope of issues contemplated by the parties

when they agreed to arbitrate disputes related to the Agreement and because it is against public policy to require claims so extraneous to the purpose of the Agreement to be subject to its requirements. The district court's ruling as to the unconscionability of the "escape hatch" clause is affirmed, but we reverse the decision to strike the entirety of the arbitration provision. Instead, that clause alone is struck and the remainder of the arbitration provision is unchanged. We remand to the district court for determination of whether the nonarbitrable claims should be stayed pending resolution of the breach of contract claim.

**{46}    IT IS SO ORDERED.**

 

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

**RODERICK T. KENNEDY, Judge**

**LINDA M. VANZI, Judge**

**Topic Index for *Clay v. N.M. Title Loans, Inc.*, No. 31,356**

**APPEAL AND ERROR**
Standard of Review

**CIVIL PROCEDURE**
Arbitration

**COMMERCIAL LAW**
Uniform Arbitration Act

**CONTRACTS**
Ambiguous Contract
Breach
Unconscionable

**NEGLIGENCE**
Breach of Duty
Negligence
Negligence Per Se

16

Negligent Hiring

**REMEDIES**
Arbitration

**TORTS**
Emotional Distress, Infliction of
Intentional Torts
Loss of Consortium
Negligence
Negligent Hiring