IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2013-NMSC-004

Filing Date: January 31, 2013

Docket No. 33,135

JOHN N. HORNE,

      Plaintiff-Respondent,

v.

LOS ALAMOS NATIONAL SECURITY, L.L.C.,
GEORGE PETER NANOS, and KEVIN W. JONES,

      Defendants-Petitioners.

ORIGINAL PROCEEDING ON CERTIORARI
Stephen D. Pfeffer, District Judge

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Jeffrey L. Lowry
Thomas A. Outler
Albuquerque, NM

for Petitioners

Timothy Lannon Butler
Santa Fe, NM

for Respondent

OPINION

BOSSON, Justice

{1}    This case arises from an employee grievance at Los Alamos National Laboratory (LANL), operated by Los Alamos National Security, LLC. After succeeding in arbitration, the employee, John Horne, filed a lawsuit in state district court in 2008, in which he alleged more expansive claims arising out of the same subject matter covered in the arbitration agreement. LANL objected, claiming that it should not have to defend against claims that either were subject to arbitration or were waived by the arbitration agreement. Accordingly,

1

we discuss the consequences that follow when an employee voluntarily contracts to arbitrate grievances and what the employee must do to preserve a subsequent lawsuit if that is his intention. In this case we side with the district court's ruling in favor of LANL, and in so doing, reverse the Court of Appeals.

**BACKGROUND**

**{2}** Horne, a twenty-year laboratory employee, received a formal written reprimand based on an alleged security infraction at LANL that concerned a failure to follow security standards regarding Classified Removable Electronic Media (CREM). In 2003, while preparing for a conference, Horne obtained twelve bar codes with which to label CREM that he intended to create. Despite being issued twelve bar codes, Horne generated only ten items of CREM. Unknown to Horne, the LANL classified electronic media custodian entered all twelve bar codes into the electronic media tracking system. When Horne returned the ten CREM items he had created, the media custodian failed to remove the two unused bar codes from the tracking system, making it appear that Horne had generated twelve items of CREM instead of only ten and was improperly retaining two.

**{3}** In July 2004, LANL discovered that two items of CREM were allegedly missing. Following an internal audit, LANL learned that the two extra bar codes associated with the CREM had been entered into the tracking system by mistake and that, in fact, nothing was missing. Despite this finding, Horne was suspended without pay, received a written reprimand, as well as a security infraction for his involvement with the incident.

**{4}** Following these events, on January 24, 2005, Horne submitted an internal laboratory complaint resolution form and requested a hearing. As grounds for a formal hearing, Horne selected "Salary decrease, withholding of salary increase, demotion, or suspension without pay" and "Retaliation for using AM 111 or any other policy that protects employees from retaliation . . ." on the complaint resolution form.[1] Attached to this form was Horne's own statement capturing his complaint as follows:

> This situation has had severe consequences in my personal life and has caused irreparable harm to my reputation and to my ability to advance in the career path that I had chosen to pursue. The association of my good name to the unsubstantiated claims and unethical actions of Pete Nanos, Kevin Jones, Mary Hockaday, Mike Irving, et al.[2] has created a hostile work environment

---

[1] AM 111 and other polices are LANL's internal administrative policies.

[2] George Peter Nanos, Jr. was the Interim Director of LANL from January 6, 2003 to May 18, 2003. Mr. Nanos became the Director of LANL on May 19, 2003, and remained in that role until May 15, 2005. In July 2004, Kevin W. Jones was the Deputy Division Leader for Los Alamos Neutron Science Center ("LANSCE"). On May 23, 2005, Mr. Jones took over as the Division Leader for the Dynamic Experimentation Division where he

for me as well as essentially destroying any hope for future advancement. This shameless attempt to validate the aforementioned acts and accusations through official sanction is not only unethical but is in violation of AM111, AM112, and AM729.

In his grievance, Horne sought: (1) removal of the letter of reprimand from his record, (2) reinstatement of his lost compensation, benefits, and vacation time, and (3) reimbursement of any fees he incurred. In the months after submitting his complaint, from February 2005 to May 2005, Horne had other negative employment experiences at LANL. For example, Horne alleged that one of the LANL directors called him a "fool" and that another LANL official told Horne he "needed to prove himself." All these negative employment experiences stemmed from the alleged missing CREM incident.

**{5}** More than two years after signing the complaint resolution form, on May 9, 2007, Horne and LANL entered into a Formal Hearing Agreement to arbitrate Horne's grievances (hereafter "arbitration agreement"). Just over a month later, on June 21, 2007, Horne signed an American Arbitration Association (AAA) demand form giving notice to LANL that the arbitration agreement was being sent to the AAA to "commence administration of the arbitration."

**{6}** The arbitration took place on December 11, 2007. The arbitrator characterized the issue to be arbitrated as whether Horne had acted reasonably in executing his duties and whether the discipline LANL imposed on Horne for the CREM infraction was "entitled to conclusive deference." Horne was completely successful at arbitration. The arbitrator found that "the decisions to find an 'infraction' on the part of Mr. Horne, and to administer discipline on that basis are wholly unreasonable."

**{7}** On February 20, 2008, the arbitrator issued his interim award. The award included a detailed and comprehensive account of the CREM incident. The arbitrator concluded that "none of the conclusions of the decision makers in this matter meet the standard of objective reasonableness . . ." and "[t]he decisions are unsupported by any evidence showing that Mr. Horne was anything other than a 'reasonable man' in his handling of CREM during October, 2003." Before issuing his award, the arbitrator cited laboratory administrative policy, AM 111.16, stating that "'[a] hearing officer . . . is limited to restoring any pay, benefits or rights lost as a result of the action taken and may, in his or her discretion, award costs, expenses, and attorneys fees in favor of the prevailing party.'"

**{8}** Ultimately, the arbitrator awarded Horne "all wages and benefits lost as a result of discipline in connection with this matter" as well as attorney's fees. The arbitrator also directed LANL "to restore any loss of rights which Mr. Horne may have sustained as a result of the unfounded 'infraction' and the adverse personnel action arising from the report of the

managed Horne. The record does not indicate who Mary Hockaday and Mike Irving are.

infraction." Apparently satisfied with the award, Horne did not move to vacate or modify the award under the New Mexico Uniform Arbitration Act. *See* NMSA 1978, §§ 44-7A-24 & -25 (2001) (permitting a party to petition the court for modification of an arbitration award on certain limited grounds).

**{9}** Nearly ten months later, on December 12, 2008, Horne filed a lawsuit against LANL and against individual laboratory employees alleging eight claims. Horne's complaint alleged: (1) retaliation under the New Mexico Fraud Against Taxpayers Act, (2) breach of contract, (3) breach of implied covenant of good faith and fair dealing, (4) intentional infliction of emotional distress, (5) constructive discharge, (6) tortious interference with existing contractual relations, (7) civil conspiracy, and in the alternative, (8) prima facie tort. Horne sought both compensatory and punitive damages as well as equitable relief and attorney's fees.

**{10}** LANL responded in district court with a motion to dismiss or in the alternative for summary judgment. LANL argued that the claims in Horne's lawsuit fell within the scope of the arbitration agreement, observing that the facts and underlying subject matter of Horne's arbitration agreement were substantially the same as the facts and subject matter alleged in support of Horne's lawsuit. LANL argued for dismissal of the lawsuit because Horne had an obligation to contest or move to vacate the arbitration award pursuant to the requirements of the Uniform Arbitration Act. Persuaded by LANL's argument, the district court found that "Horne entered into an arbitration agreement that waived his right to seek judicial relief for the claims set forth in this lawsuit." The district court granted LANL's motion for summary judgment and dismissed the case with prejudice. *See* Rule 1-056 (C) NMRA.

**{11}** Horne appealed. In a memorandum opinion, the Court of Appeals reversed the district court. *Horne v. Los Alamos Nat'l Sec.*, No. 29,822, slip. op. at 2 (N.M. Ct. App. Jul. 5, 2011) (unpublished). The Court of Appeals held that "[b]ecause LANL has not shown whether the arbitrator ruled on the scope of the arbitration agreement, and because this appears to be a disputed issue of material fact, we reverse." *Id.* In reversing, the Court of Appeals discussed res judicata or claim preclusion, concluding that the district court had failed to make an independent ruling on the scope of arbitration and whether the lawsuit fell within it—a question that raises a genuine issue of material fact. *Id.* at 2, 15. Accordingly, summary judgment was improper, and the Court of Appeals reversed and remanded to the district court to determine the scope of the arbitration agreement. *Id.* at 2, 15-16.

**{12}** Although we agree with much of the Court of Appeals' legal discussion, we disagree with the result. For the following reasons, we conclude that Horne—as the party seeking to litigate despite both an agreement to arbitrate and an arbitration in fact—was obliged to obtain a scope-of-arbitration ruling first from the arbitrator. Because Horne never obtained such a ruling, the district court correctly awarded summary judgment to LANL.

**DISCUSSION**

4

**Standard of Review**

**{13}** We apply a de novo standard of review to orders granting or denying summary judgment. *Summers v. Ardent Health Servs., L.L.C.*, 2011-NMSC-017, ¶ 10, 150 N.M. 123, 257 P.3d 943. "[W]hether the parties have agreed to arbitrate presents a question of law, and we review the applicability and construction of a contractual provision requiring arbitration de novo." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 11, 146 N.M. 256, 208 P.3d 901.

**Summary Judgment**

**{14}** In New Mexico, "[s]ummary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280 (internal quotation marks and citation omitted). The party moving for summary judgment must make a prima facie showing and come forward with "such evidence as is sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted. The movant need not demonstrate beyond all possibility that no genuine factual issue existed." *Rivera v. Brazos Lodge Corp.*, 111 N.M. 670, 672, 808 P.2d 955, 957 (1991).

**{15}** Once the movant makes a prima facie showing, the party opposing summary judgment has the burden "to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Romero*, 2010-NMSC-035, ¶ 10 (internal quotation marks and citation omitted). "A party may not simply argue that such [evidentiary] facts might exist, nor may it rest upon the allegations of the complaint." *Id.* (alteration in original) (internal quotation marks and citation omitted). Instead, the "party opposing the summary judgment motion must adduce evidence to justify a trial on the issues." *Id.* (internal quotation marks and citation omitted).

**Arbitration**

**{16}** As this Court has previously stated, there is "strong public policy in this state . . . in favor of resolution of disputes through arbitration." *Lisanti v. Alamo Title Ins. of Tex.*, 2002-NMSC-032, ¶ 17, 132 N.M. 750, 55 P.3d 962 (internal quotation marks and citation omitted). "When a party agrees to a non-judicial forum for dispute resolution, the party should be held to that agreement." *Id.* Additionally, arbitration agreements are contracts enforceable by the rules of contract law. *See Santa Fe Techs., Inc. v. Argus Networks*, 2002-NMCA-030, ¶ 52, 131 N.M. 772, 42 P.3d 1221. "Courts are to interpret the provisions of arbitration agreements by the rules of contract law and are to apply the plain meaning of the language utilized, in order to give effect to the agreements struck by the parties." *Pueblo of Laguna v. Cillessen & Son, Inc.*, 101 N.M. 341, 343, 682 P.2d 197, 199 (1984). "The terms of the [arbitration] agreement define the scope of the jurisdiction, conditions, limitations and restrictions on the matters to be arbitrated." *Christmas v. Cimarron Realty Co.*, 98 N.M. 330, 332, 648 P.2d 788, 790 (1982). Finally, under New Mexico's Uniform Arbitration Act,

5

"[a]n agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." NMSA 1978, § 44-7A-7(a) (2001).

**The Parties' Arbitration Agreement**

{17}    Horne voluntarily entered into a contractual agreement with LANL to arbitrate his grievances. To demonstrate the breadth of that agreement, LANL attached to its summary judgment motion the Formal Arbitration Agreement, the internal complaint resolution form, and Horne's personal statement summarizing his complaint. These documents provided support for LANL's two statements of undisputed material fact that Horne (1) filed an internal administrative complaint with LANL on January 24, 2005, and (2) entered into an agreement to arbitrate with LANL on May 9, 2007. Neither party has ever claimed to have revoked this agreement. *See* § 44-7A-7(a).

{18}    Significantly, the arbitration agreement specified that "[t]he formal [arbitration] hearing *will resolve all matters raised in the complaint* that have not been previously resolved" and that "[t]he employee agrees that *s/he will not file any administrative or legal actions regarding the matters raised in the complaint*." (Emphasis added.)[3] According to LANL, when Horne agreed "not [to] file any administrative or legal actions," he waived any right to bring a subsequent lawsuit in favor of arbitration. Thus, the only issue for the district court to determine on summary judgment was whether the allegations in Horne's lawsuit were within the scope of Horne's arbitration agreement ("the matters raised in the complaint").

{19}    Responding to the motion for summary judgment, Horne claimed that LANL had not made a prima facie case for summary judgment, and thus, he had "no requirement . . . to make any showing as to factual issues." Perhaps anticipating the risk of such a position, Horne did submit a response with an accompanying affidavit. Horne attached to his response the American Arbitration Association Employment Arbitration Rules Demand for Arbitration (demand form) that he had signed and submitted to the AAA as well as the arbitrator's interim decision following arbitration. Horne is listed as the claimant on the demand form, effectively notifying LANL that he was filing his arbitration request with the AAA. Although Horne was listed as the claimant on the demand form, he alleged on summary judgment that LANL actually prepared the form and he merely signed it.

{20}    Horne makes much of this particular arbitration demand form, arguing that this was the "controlling element in the scope of arbitration" and that it "severely narrowed" the

---

[3] The arbitration agreement also stated that "[t]he employee represents that s/he has not filed any administrative or legal actions regarding the matters raised in the complaint . . . [and] agrees to withdraw or dismiss any administrative or legal actions that s/he has filed regarding the matters raised in the complaint."

6

scope of arbitration.  The demand form listed only two issues under the nature of the dispute: (1) "Was the written reprimand with a ten day suspension without pay issued to Mr. Horne on December 16, 2004 done in compliance with laboratory policies and procedures?" and (2) "Was Mr. Horne retaliated against for having utilized the IG's [Inspector General's] whistleblower hotline?"  On this particular demand form, a statement at the bottom of the form is instructive as to its use.  The statement reads that "[t]o begin proceedings, please send two copies of this demand and *the arbitration agreement*, with the filing fee as provided for in the rules, to the AAA.  Send the original demand to the respondent." (Emphasis added.)  As best we can tell, the demand form is what the parties send, along with a filing fee and a copy of the actual arbitration agreement, to the AAA to set the arbitration process in motion.  *See* American Arbitration Association, *Employment Arbitration Rules and Mediation Procedures* 18 (amended and effective Nov. 1, 2009), available at http://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004362&revision=latestreleased (providing instructions on how to initiate arbitration and stating that "[t]he [d]emand shall set forth . . . a brief statement of the nature of the dispute").  We think it is unlikely, therefore, that the demand form alone, as opposed to the arbitration agreement, controlled the scope of the arbitration.

**{21}**    When pressed by the district judge as to why he had signed this demand form narrowing the issues he could arbitrate, Horne replied that LANL's human resources department had told him that this was the way to begin the arbitration process.  Continuing with his response to the judge, Horne stated that he had asked LANL to "expand the scope of arbitration" because he wanted "everything [to be] arbitrated."  According to Horne, LANL refused to expand the arbitration, stating "[w]e refuse to change the contract."  At oral argument before this Court, LANL confirmed its position, stating that it "refused to change the contract; . . . the scope of the arbitration was set, and the Laboratory refused to expand it."

**{22}**    Reviewing this procedural history leading up to arbitration, very little is clear about what the parties did or did not agree to arbitrate—in other words, the scope of the arbitration agreement.  Before arbitration began, Horne apparently viewed the arbitration agreement broadly; LANL viewed it narrowly.  Clearly there was a dispute. The question is:  what was Horne's obligation at this point, going into arbitration, to clarify or attempt to resolve the dispute.

**{23}**    We look first to the arbitration agreement itself and ask whether the parties contractually agreed to a dispute-resolution mechanism.  The arbitration agreement specifically provided that "[t]he hearing officer will have *exclusive authority* to resolve disputes relating to interpretation and/or applicability of this Agreement and AM111 except to the extent that such authority is specifically reserved in AM111 to the Laboratory or LANL." (Emphasis added.)  Thus, the arbitration agreement appears to give the arbitrator authority to resolve disputes over the interpretation and scope of the arbitration agreement.

7

**{24}** We recognize that a court generally determines whether "a controversy is subject to an agreement to arbitrate." Section 44-7A-7(b). When, however, the parties have "clearly and unmistakably" reserved an issue to the arbitrator, then the arbitrator shall proceed to decide it. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Clay v. N.M. Title Loans, Inc.,* 2012-NMCA-102, ¶ 10, 288 P.3d 888, 893 ("The Court uses ordinary state-law principles that govern the formation of contracts to determine whether the parties clearly and unmistakably agreed to arbitrate an issue, including arbitrability." (internal quotation marks and citation omitted)).

**{25}** Having contractually agreed to vest "exclusive authority" in the arbitrator "to resolve disputes relating to interpretation and/or applicability of this Agreement," Horne was contractually obliged to take any such dispute to the arbitrator, at least to attempt a resolution. Yet the record is unclear what, if anything, Horne did to raise his concerns with the arbitrator. The summary judgment record includes only Horne's unsupported statements in his response to LANL's motion for summary judgment and Horne's attached affidavit. The response and the affidavit are almost identical, with both documents listing Horne's allegations verbatim. These statements are mainly irrelevant to our consideration here because they reiterate the merits of what happened during the CREM incident and describe additional negative employment experiences Horne suffered as a result.

**{26}** However, specifically pertaining to the scope of the arbitration agreement, Horne alleged in his summary judgment response that:

> [p]rior to the arbitration hearing, Horne sought to expand the scope of the hearing to deal completely with all of the issues raised in his administrative grievance or, alternatively to withdraw from the arbitration process. LANL refused to allow expansion of the scope of the arbitration to meet the requirements of AM-111.32[4] and to encompass Horne's full grievance. LANL also refused to allow Horne to withdraw from the arbitration.
>
> At the December 11, 2007, arbitration hearing, Horne withdrew his IG retaliation claim. Horne agreed the only issue to be tried was the policy and procedure violation, objected to the improper narrow scope of the

---

[4] AM 111.32 itself is not in the record. From what we can gather from Horne's pleadings in the record, a portion of this policy states,

> [b]efore the complaint proceeds to formal hearing, the employee must agree to the terms and conditions of a formal hearing by signing a written agreement that contains [a] copy of the formal complaint along with a statement that the hearing *must resolve* all matters raised in the complaint that have not been previously resolved.

(Internal quotation marks omitted.)

8

proceeding, objected to having had to select his remedy before having been provided with relevant documents and information (until after selection of binding arbitration) and specifically reserved his rights to bring other claims outside the scope of the arbitration.

**{27}** Horne provided no evidence of how he "sought to expand the scope" of the arbitration. It does not appear to have been raised with the arbitrator, only with LANL. Horne does not explain why he withdrew his retaliation claim or how LANL or the arbitrator responded to his objections. Horne claims that he "objected to the improper narrow scope of the proceeding" but does not claim to have sought a ruling from the arbitrator. The same is true for Horne's assertion that he "specifically reserved his rights" to bring a later lawsuit.

**{28}** Viewing Horne's affidavit in its most favorable light, it appears that Horne did not raise these scope-of-arbitration issues with the arbitrator, at least not on the record and not in such a manner as to obtain a ruling, at a time when something could have been done about it. To the contrary, it appears that Horne agreed with LANL, however reluctantly, to a narrow scope of arbitration, and then reserved to himself, unilaterally, the right to go to court. In this respect, Horne's decision was ill-advised as a matter of law.

**{29}** In his choice between alternative courses of action, Horne displayed a fatal misapprehension of the policies underlying arbitration. If Horne was truly dissatisfied with the scope of the arbitration agreement or the scope of the issues actually arbitrated, Horne could have done one of several things—none of which include filing a lawsuit a year later on claims arising out of the same underlying subject matter.

**Horne's Other Options**

**{30}** First, Horne was obligated to object to the scope of the arbitration agreement with the arbitrator and not just LANL and to request that the arbitrator expand the scope of the arbitration to encompass all of his grievances. The arbitration agreement indicates as much. In cases arising in other contexts, mainly relating to the arbitrator's jurisdiction, or the arbitrator's ability to decide a particular dispute, courts have indicated that parties need to make express, forceful objections to the arbitrator when they have a dispute.

**{31}** For example, in *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1148 (10th Cir. 2007), the court held that a party had waived his ability to argue that, as a matter of basic contract law, an arbitration agreement was unenforceable. In reaching its decision, the court stated that the party had proceeded "with arbitration without placing any objection clearly on the record prior to or during the arbitration." *Id.* The court noted that the party had only made a "general complaint" and stated that "[a] party's bare statement that he does not want to arbitrate a dispute is, of course, not a legal argument or objection, but instead merely signals 'buyer's remorse' that he agreed at the outset to arbitrate future disputes." *Id.* at 1150. *See also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 946 (1995) (describing how a party was "forcefully objecting" to the arbitrator's jurisdiction and noting

the party had filed a "written memorandum objecting to the arbitrators' jurisdiction"); *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 9 n.10 (1st Cir. 2000) (noting that a party "consistently and vigorously maintained its objection to the scope of arbitration").

{32}    Additionally, the 2007 rules of the AAA are instructive as to how Horne could have addressed the scope of the arbitration in terms of the full breadth of his grievances.[5]   In dealing with waiver of the right to object and with lack of compliance with the rules, the AAA rules state that "[a] party who proceeds with arbitration after knowledge that any provision or requirement of these rules has not been complied with, and who fails to state objections thereto *in writing or in a transcribed record*, shall be deemed to have waived the right to object."  *American Arbitration Association supra*, at 35 (emphasis added).[6]   In discussing the arbitrator's jurisdiction, the rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  *Id.* at 20.

{33}    At oral argument, Horne conceded to this Court that "no one invoked the arbitrator's authority to decide scope."  It follows that Horne did not expressly, vigorously, consistently, or forcefully object to the scope of the arbitration, either in writing or in a transcribed record, or assure that the arbitrator made the record clear that Horne objected to the arbitration's scope.  Though Horne may have asserted such objections privately to LANL, he needed to present them publicly on the record to the arbitrator and obtain a ruling.

{34}    It is helpful to consider what might have happened if Horne had clearly raised his objections concerning the scope of the arbitration agreement with the arbitrator.  Had Horne expressly objected to the arbitration's narrow scope, LANL or the arbitrator might very well have relied upon the limited remedial relief available to Horne under internal LANL regulations referenced in the arbitration agreement.  AM 111.16, states that "[a] hearing officer . . . is limited to restoring any pay, benefits or rights lost as a result of the action taken

---

[5] We recognize that the arbitration agreement specifies that

> [t]he parties agree that the hearing will be conducted under the authority of and in accordance with the provisions of AM 111 and the rules of the organization providing the hearing officer, insofar as the organization's rules are consistent with AM 111.  In the event of a conflict between AM 111 and the rules of the organization, AM 111 will take precedence.

Although we do not know what AM 111 specifically states and whether LANL's internal rules would take precedence over these specific portions of the AAA rules, the AAA rules are nonetheless useful in providing guidance to Horne as to what he should have done to properly raise his issues regarding the scope of the arbitration.

[6] We note that these specific portions of the AAA rules remained unchanged from the 2007 to 2009 version of the rules.

and may, in his or her discretion, award costs, expenses, and attorneys fees in favor of the prevailing party."

**{35}** Assuming that LANL or the arbitrator had relied on this regulation to deny Horne's request to expand the scope of the issues to be arbitrated, then at the very least the scope of arbitration would have been determined by the very authority specified in the contract. LANL's position, whether or not its agreement to arbitrate was "limited to restoring any pay, benefits or rights lost," to the exclusion of any other issues or other relief, would have been placed clearly on the record. Importantly, after persuading the arbitrator not to broaden the scope of arbitration, leaving Horne no choice but to litigate, LANL would have had a hard time in court interposing arbitration as a defense to litigation.

**{36}** On the other hand, if Horne had explicitly objected to the scope of the arbitration agreement and clearly requested and made a record that he wanted to reserve his rights to litigate those matters not arbitrated, LANL might have been put to a hard choice. LANL might have changed its mind, preferring the efficiency that comes from resolving all disputes in one forum. We will never know, because Horne never put the issue squarely to LANL and to the arbitrator.

**{37}** Alternatively, Horne could have asked LANL and the arbitrator to agree to modify or clarify the arbitration agreement, thereby agreeing that Horne could either arbitrate everything or litigate what he could not. Instead, Horne asserts that he withdrew his retaliation claim and reserved his right to bring other claims to court outside the scope of arbitration. Again, there is no evidence in the record, beyond Horne's assertions, of how this happened or whether LANL agreed to this, but it would appear not. Instead, Horne appears to have acted unilaterally. *See Abondolo v. Jerry WWHS Co.,* 829 F. Supp. 2d 120, 128 (E.D.N.Y. 2011) (describing what a party needs to do when challenging the arbitrator's ability to decide a dispute, stating that "[a] simple statement of reservation of rights is not enough, however, but rather a forceful objection is necessary to indicate an unwillingness to submit to arbitration" (internal quotation marks and citation omitted)).

**{38}** Neither party had the authority, acting alone, to limit the scope of arbitration. It may well be, as Horne intimates, that LANL wrongfully narrowed the scope of arbitration. But as we have said, in that event it was incumbent on Horne to make his case to the arbitrator. "When the parties agree to arbitrate any potential claims or disputes arising out of their relationships by contract or otherwise, the arbitration agreement will be given broad interpretation unless *the parties themselves* limit arbitration to specific areas or matters." *K.L. House Constr. Co. v. City of Albuquerque*, 91 N.M. 492, 494, 576 P.2d 752, 754 (1978) (emphasis added); *accord* UJI 13-817 NMRA (stating that there must be mutual assent of both parties in order to effectively modify a contract); *see also Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 322 (3d Cir. 2006) ("[U]nilateral statements or actions made after an agreement has been reached or added to a completed agreement clearly do not serve to modify the original terms of a contract." (internal quotation marks and citation omitted)).

11

**{39}** Assuming Horne presented his scope-of arbitration dispute to the arbitrator and he remained unsatisfied with what the parties arbitrated, he could have moved to contest the arbitration award. In *United Technology & Resources Inc., v. Dar Al Islam*, 115 N.M. 1, 2, 4, 846 P.2d 307, 308, 310 (1993), we held that a party who did not contest an arbitration award within the ninety-day statutory framework was barred from challenging an arbitrator's ruling. In that case, the arbitration panel had determined that it lacked authority to award attorney's fees to the prevailing party. *Id.* at 2, 846 P.2d at 308. A year after the arbitration, one of the parties moved to confirm the award in the district court. *Id.* at 3, 846 P.2d at 309. We stated that "[b]y failing to file a motion to modify or correct within ninety days after delivery of the arbitrator's award [the prevailing party] waived its right to present its substantive defenses to confirmation of the award." *Id.* at 5, 846 P.2d at 311.

**{40}** Additionally, before the arbitration occurred, Horne might have sought a declaratory judgment from the district court to clarify his rights under the contractual arbitration agreement. Under New Mexico's Declaratory Judgment Act, "Any person interested under a . . . written contract or other writings constituting a contract . . . may have determined any question of construction or validity arising under the instrument, . . . contract . . . and obtain a declaration of rights, status or other legal relations thereunder." NMSA 1978, § 44-6-4 (1975). Moreover, under this same act, "A contract may be construed either before or after there has been a breach thereof." NMSA 1978, § 44-6-5 (1975). We do, however, recognize that under New Mexico's Uniform Arbitration Act, a court's ability to grant provisional remedies is limited once an arbitrator is appointed and authorized to act. *See* NMSA 1978, § 44-7A-9(b)(2) (2001). If the arbitrator is appointed and authorized to act, "a party to an arbitration proceeding may move the court for a provisional remedy only if the . . . arbitrator is not able to act timely or the arbitrator cannot provide an adequate remedy." *Id.*

**{41}** Courts take differing perspectives as to whether parties subject to arbitration agreements can seek a declaratory judgment regarding their arbitration agreement. "An action may be brought under a declaratory judgment act to determine questions arising out of an arbitration clause." 21 Richard A. Lord, *Williston on Contracts: A Treatise on the Law of Contracts*, § 57:26, at 242 (4th ed. 2001). Additionally, "[a] declaratory judgment may be granted to determine . . . whether a matter in dispute comes within the scope of an arbitration agreement." *Id.* at 242-43. Some courts believe that seeking a declaratory judgment prior to arbitration would "thwart the legislative purpose of arbitration as an informal, expeditious, and final resolution of disputes." *Soc'y of Am. Foresters v. Renewable Natural Res. Found.*, 689 A.2d 662, 669 (Md. Ct. Spec. App. 1997). Others believe that "[a]rbitration is simply a matter of contract between the parties, . . . and a circuit court may construe a party's right under a contract by way of a declaratory judgment." *Morton v. Polivchak*, 931 So. 2d 935, 940 (Fla. Dist. Ct. App. 2006).

**{42}** We need not decide here what role declaratory judgments have when parties enter arbitration agreements. It suffices to say that if the district court had issued a declaratory judgment specifying the scope of Horne's contractual rights under the arbitration agreement, it is unlikely this case would be here today. The district court could have declared whether

12

Horne and LANL were going to arbitrate a broad or narrow set of issues, and the declaratory judgment would have "serve[d] a useful purpose in clarifying and settling the legal relations between the parties and [would have] afford[ed] relief from uncertainty, insecurity[,] controversy . . . [, and] serious financial damage." *Lehigh Coal & Navigation Co. v. Cent. R. R. of N.J.*, 33 F. Supp. 362, 366 (E.D. Pa 1940).

**{43}**    Horne might have had still another option. If Horne had elected not to participate in arbitration because LANL refused to agree to address all of his grievances, then he could have filed his lawsuit before the arbitration took place. No doubt, LANL would have asserted arbitration as a defense. At that point, the court could have conducted its "initial screening process . . . to determine in general terms whether the parties have agreed that the subject matter under dispute should be submitted to arbitration." *K. L. House Constr. Co. v. City of Albuquerque*, 91 N.M. 492, 494, 576 P.2d 752, 754 (1978). "Once it appears that there is, or is not a reasonable relationship between the subject matter of the dispute and the general subject matter of the underlying contract, the court's inquiry is ended." *Id.* Presumably then, there would have been a clear determination about the scope of the issues Horne and LANL would arbitrate and whether Horne could later litigate issues not subject to arbitration. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.)".

**{44}**    Regrettably, Horne chose the one course of action we cannot endorse. He chose to arbitrate some issues, while unilaterally claiming to withhold others for litigation, without submitting the dispute to the arbitrator for guidance. *See Town of Silver City v. Garcia*, 115 N.M. 628, 632, 857 P.2d 28, 32 ( 1993) ("[P]arties who agree to have their disputes resolved through arbitration cannot later relitigate the merits of the arbitrated issues in the district court."). Arbitration is supposed to function as a cost-effective and efficient resolution of disputes, and if necessary, courts are to have a limited role in interpreting arbitration awards. *See id.* Obviously, that did not happen here.

**{45}**    After considering all of the relevant documents and options available to contest the scope of the arbitration agreement, both before and after the arbitration occurred, we conclude that LANL properly moved for summary judgment and the district court appropriately granted judgment in LANL's favor. *See Clay v. N.M. Title Loans, Inc.,* 2012-NMCA-102, ¶ 20, 288 P.3d 888 ("A party may be assumed to have intended to arbitrate issues that are closely related to those governed by the agreement itself, but not those that are unrelated to the agreement, out of the context of the agreement, or outrageous and unforeseeable.").

**{46}**    Finally, Horne argues that "[t]he facts, issues, claims, and time frame of events set out in [his] civil complaint . . . manifestly exceed those set out in his [administrative] grievance" and therefore are not within the scope of the arbitration agreement. As we stated earlier, very little was clear about what the parties did and did not agree to arbitrate. As a general matter, arbitration agreements "are drafted with broad strokes and, as a result,

13

require broad interpretation." *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 2002-NMCA-030, ¶ 55, 131 N.M. 772, 42 P.3d 1221. When parties voluntarily contract to arbitrate their grievances, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Heimann v. Kinder-Morgan CO2 Co.*, 2006-NMCA-127, ¶ 13, 140 N.M. 552, 144 P.3d 111 (alteration in original) (quoting *AT&T Techs.*, 475 U.S. at 650).

**{47}**   We conclude that Horne's lawsuit was just another way of repackaging the claims he contractually agreed to arbitrate. All the claims within Horne's lawsuit stemmed from the same underlying conduct—the CREM incident and the consequences Horne suffered because of it. Therefore, absent anything in the record to support a conclusion that the parties modified the arbitration agreement, we think that Horne's argument that the claims in his civil lawsuit were not within the scope of his arbitration agreement are unpersuasive.

**CONCLUSION**

**{48}**   For the foregoing reasons, we reverse the Court of Appeals and reinstate the district court's grant of summary judgment in LANL's favor.

**{49}   IT IS SO ORDERED.**

_____
       **RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**CHARLES W. DANIELS, Justice**

_____
**BARBARA J. VIGIL, Justice**

**Topic Index for *Horne v. Los Alamos Nat'l Sec., L.L.C.*, No. 33,135;**

**APPEAL AND ERROR**
Standard of Review

**CIVIL PROCEDURE**
Arbitration
Summary Judgment

**EMPLOYMENT LAW**
Disciplinary Action
Employee Grievances

**JUDGMENT**
Declaratory Judgment

**REMEDIES**
Arbitration